STATE of Wisconsin, Plaintiff-Respondent,

v.

Andrew G. CHITWOOD, Defendant-Appellant.†

Court of Appeals

*No. 2015AP97–CR. Submitted on briefs January 21, 2016.—Decided April 13, 2016.*

**2016 WI App 36**

(Also reported in 879 N.W.2d 786.)

† Petition for Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kaitlin A. Lamb*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Warren D. Weinstein*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

¶ 1. NEUBAUER, C.J. Andrew G. Chitwood appeals from a judgment of conviction rendered after a

jury found him guilty of operating a motor vehicle under the influence of drugs and after revocation. During trial, the State offered the testimony of Nathan Peskie, a drug recognition evaluator, who had examined Chitwood while he was in the hospital after a single-car accident and concluded that he was impaired by a central nervous system depressant and narcotic analgesic. Peskie's testimony was admitted over the objection of defense counsel who argued that Peskie's opinion was unreliable and, thus, inadmissible under the *Daubert* standard codified in WIS. STAT. § 907.02(1) (2013–14).[1] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). This was because, owing to Chitwood's injuries, Peskie was unable to complete all twelve steps of the drug recognition evaluation protocol. We hold that the circuit court did not erroneously exercise its discretion when it admitted Peskie's testimony and therefore we affirm the judgment.

## FACTUAL BACKGROUND

¶ 2. The defendant, Andrew G. Chitwood, who had four prior operating while intoxicated convictions, was charged with operating a motor vehicle under the influence of a combination of intoxicant, controlled substance and controlled substance analog—fifth or sixth offense—and operating a motor vehicle after revocation.[2] *See* WIS. STAT. §§ 346.63(1)(a), 343.44(1)(b). Section 346.63(1)(a) prohibits driving or operating a motor vehicle while under the influence of an intoxi-

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

[2] Chitwood was also charged with failure to install an ignition interlock device and misdemeanor bail jumping. Prior to trial, he pled guilty to those offenses.

cant or other drug to a degree which renders the person "incapable of safely driving."

## Trial

### Testimony of Eyewitness Randy Eller

¶ 3. At trial, Randy Eller testified that on October 28, 2011, at around 1:30 p.m., he was driving along Hillside Road when he observed a car in a ditch. The headrest on the driver's seat and the passenger's rear window were missing. The person in the driver's seat, whom Eller identified as Chitwood, had "blood all over his face." Chitwood was unable to exit the car from the driver's side door and ultimately had to use the rear driver's side window. Chitwood "didn't want [Eller] to call the police" because his father was coming to get him, but Eller insisted due to Chitwood's injuries. Chitwood had blood coming from "bad cut[s]" on his forehead and chin, which Eller thought needed stitches. Chitwood said that "an animal jumped out in front of him and he had to swerve to miss it."

### Testimony of Responding Officer Eric Essinger

¶ 4. Eric Essinger, a deputy sheriff for Washington County at the time of the incident, testified that he responded to the scene and observed Chitwood seated on the ground next to the front passenger side tire of the vehicle. There was "a lot of blood on [Chitwood's] face," and Essinger was unable to identify the exact area of injury. Chitwood told Essinger that he had swerved to miss a squirrel, but, a short time later, said it may have been a raccoon. Chitwood "appeared to be very relaxed, almost very lackadaisical," was speaking very slowly, and it was difficult to understand his

responses. Chitwood appeared to have "a hard time staying awake. His head was bobbing from side-to-side. His eyes were real slow in opening and closing." After blinking, "he would have a hard time finding where [Essinger] was[,] and [Essinger] wasn't moving." These things "didn't appear to be normal behavior." Essinger thought that Chitwood might be under the influence of drugs or alcohol, but, when asked, Chitwood denied it. Essinger asked if Chitwood had taken any medication, and he said he had taken oxycodone and some other prescription medications earlier that day, but he could not recall their names. After Essinger had spoken with Chitwood for about five minutes, an ambulance arrived and placed him in a cervical collar and on a backboard in the back of the ambulance. As a result, Essinger was unable to conduct any field sobriety tests of Chitwood.

¶ 5. Regarding the scene, Essinger, a traffic crash reconstructionist investigator, saw tire tread marks running from the road to a black mailbox. The mailbox had a dent in the lower right corner and a white paint transfer; there was mail strewn about the box. Past the mailbox, there were black tire marks along the gravel shoulder and the grass ditch, leading to the vehicle's final resting location by some trees, which had been damaged. Based on the tread marks, Essinger thought that Chitwood was drifting off the road, neither accelerating nor heavily braking. Essinger remarked that the tire marks appeared to indicate a "hard left-hand steering maneuver," then a "hard right-hand turning maneuver," and then the vehicle spun "in a clockwise direction." These marks did not indicate a swerve to avoid an animal.

¶ 6. At the hospital, Chitwood was "having a hard time speaking . . . his eyes were still opening and

137

closing very slowly, and it appeared that he was sleeping or falling asleep." Essinger observed that Chitwood did not respond to questions medical personnel asked. Based on Essinger's observations of the scene and Chitwood, and Chitwood's admission to having taken oxycodone, Essinger placed Chitwood under arrest. Upon his consent, Chitwood's blood was drawn, and Essinger requested the laboratory test for alcohol and a complete drug panel.

¶ 7. Around 6:00 p.m., after Chitwood had received medical attention, Essinger transported Chitwood to jail. By then, Chitwood's condition had changed, he was talking in a "more crisp tone," and he was able to walk without assistance.

*Testimony of Forensic Toxicologist Sara Schreiber*

¶ 8. Sara Schreiber, a forensic toxicologist at the Wisconsin State Crime Laboratory who tested Chitwood's blood, testified that the blood draw revealed the presence of oxycodone (33 ug/L), citalopram (62 ug/L), carisoprodol (9.6 mg/L), and meprobamate (30 mg/L). Alcohol was not detected in Chitwood's blood. Schreiber noted that oxycodone is for pain management, citalopram is an antidepressant, carisoprodol is a sedative/muscle relaxer, and meprobamate is a metabolite of carisoprodol. The citalopram was at therapeutic levels. The level of oxycodone found in Chitwood's blood could be interpreted in different ways. If the prescription was for Percocet, which comes only in a normal, not an extended, release, then this level, a peak, would be consistent with someone who took an approximate ten milligram dose about two hours prior to the collection of blood. Alternatively, that level could be achieved by taking a higher concentration more than two hours earlier so that the level of oxycodone

peaked at some other level and came down to thirty-three micrograms. Chitwood's test results for carisoprodol (brand name Soma) were three times the therapeutic dose.

¶ 9. Schreiber testified that oxycodone, a narcotic analgesic and central nervous system depressant, at the levels found in Chitwood's blood, would likely constrict a person's pupils, cause droopiness in the eyes, drowsiness, lack of muscle coordination, and slowing and slurring of speech. Carisoprodol, a muscle relaxant/sedative, at a high dose would likely result in dizziness, confusion, and drowsiness, reflected in difficulty in keeping one's eyes open.

¶ 10. Schreiber expected the drugs to have been in Chitwood's system at the time he was operating his vehicle and that a "regular person" would be unable to operate a motor vehicle safely given the combination and high level of drugs. She explained that if a person took one type of drug that caused drowsiness and took another type that did the same thing, the effect would be compounded. Schreiber also indicated there was a "high probability" that the "average person with the average tolerance" and with these levels of drug concentrations would not be able to operate a vehicle safely, but she acknowledged there could be a person with "a very good tolerance to these drugs" who could "handle those levels." Schreiber had never met Chitwood and did not know his tolerance level. In other words, depending on his prescription drug history, there was a "possibility" that the concentrations of drugs in Chitwood's system might not impair his ability to drive safely. Nevertheless, tolerance did not necessarily mask all the effects of the drugs. While "[s]ome people are able to perform through some of the symptoms . . . it doesn't necessarily mean that every-

thing is totally good and fine and that they wouldn't suffer any of the side effects at all."

*Testimony of Drug Recognition Evaluator Nathan Peskie*

¶ 11. Nathan Peskie, a deputy sheriff with Washington County, testified that he was certified as a drug recognition evaluator. Peskie explained that an average law enforcement officer is trained to detect whether a person is under the influence of alcohol, and, while the same standard field sobriety tests are applicable to drugs, additional tests are required to determine whether impairment is by drugs. In this regard, a drug recognition evaluator receives additional training beyond that of the average law enforcement officer. Peskie's training consisted of eighty hours of classroom training and forty hours of field certification training. The classroom training covered the seven drug categories and proficiency in standard field sobriety tests. During field training, for twelve hours a day, Peskie practiced identifying persons impaired by drugs and attempted to identify which drug category caused impairment. To become certified, Peskie had to identify eighty percent of the test subjects correctly; Peskie scored 100%. Annually, Peskie attends eight hours of training on drugs and alcohol impairment in order to be recertified as a drug recognition evaluator. He has been continuously certified since 2007.

¶ 12. Peskie testified that in order to distinguish whether a person is under the influence of drugs or alcohol, a twelve-step procedure, used throughout the United States, is employed. He recounted the twelve steps as follows: (1) check for breath alcohol; (2) interview the arresting officer; (3) check pulse, horizontal gaze nystagmus (HGN)

and pupil size; (4) conduct "full battery of HGN checks," which includes "smooth pursuit, nystagmus at maximum deviation, prior to forty-five degrees," vertical gaze nystagmus (VGN), and lack of convergence of the pupils; (5) conduct divided attention tests, which include the Rhomberg test, the walk-and-turn test, the one-leg stand test, and finger-to-nose test; (6) check vital signs, such as pulse, blood pressure, and body temperature; (7) check pupils in different lighting conditions and then check nasal and oral cavities for signs of drug use; (8) check muscle tone; (9) check for injection sites; (10) ask questions about drug use; (11) record his opinion; and (12) review toxicology reports. In the last step, Peskie stated, he does not receive the toxicology results until after he has rendered an opinion on whether the person was impaired and, if so, by which drugs.

¶ 13. Peskie testified that because Chitwood was wearing a cervical collar and on a backboard in the trauma room of the emergency room and, thus, he did not want to interfere with medical attention, Peskie conducted only a partial drug recognition evaluation on Chitwood. When the State inquired whether Peskie could render an opinion as to the presence of any drugs, defense counsel objected on the basis of lack of foundation and speculation.

¶ 14. Outside the presence of the jury, defense counsel explained that a foundation for Peskie's opinion was lacking because he conducted only a partial evaluation. The prosecutor suggested that in order to establish a foundation she be permitted to ask Peskie if he could render an opinion based on a partial examination. Peskie stated that he was able to render an opinion based on a partial examination, that this was allowed by the protocol, and that he had been

141

trained in how to render an opinion with only partial information. Peskie explained that the twelve steps were "the ideal process," but that it was "common," for example where a person was involved in a motor vehicle accident, to be unable to conduct all twelve steps. It was also common to determine that a person was not impaired based on only a partial evaluation. Peskie's training included scenarios where only a partial evaluation could be conducted.

¶ 15. The court then permitted defense counsel to conduct a voir dire examination of Peskie. Peskie stated that in his training he had been given "face sheets" that were only partially completed, from which he was required to form an opinion. Some of the face sheets were similar to Chitwood's case. However, none of the field certifications he conducted involved injuries. Consideration of possible medical conditions, and specifically head injuries, were part of Peskie's training, but Peskie did not know what Chitwood's medical diagnosis was. He did testify, however, that he did not observe "any signs of a head injury, which [he] had been trained in, that would have prevented [him] from conducting HGN for example."

¶ 16. In response to a follow-up question from the prosecutor, Peskie answered that his classroom training and recertifications also involved partial evaluations.

¶ 17. The court ruled that Peskie would be permitted to give his opinion on whether Chitwood was intoxicated. In doing so, the court found that Peskie's opinion was not "expert scientific testimony" and, thus, *Daubert* did not apply. *Daubert*, 509 U.S. at 579. Drug recognition evaluations were similar to standardized field sobriety tests, the court said. Defense counsel would be permitted to cross-examine Peskie about his

142

lack of training or experience under identical circumstances, but that would go to the weight of his testimony.

¶ 18. Continuing his testimony, Peskie stated that whether he was able to form an opinion on intoxication based on a partial evaluation depended on the information he was able to gather. Peskie would use the tests he conducted, the statements and observations of the arresting officer, and "the manner of the contact." In this instance, he was able to render an opinion. He told the jury that he had performed partial evaluations in the past, for example, where the driver was injured or had a "physical defect," such as a bad back or knees or even persons who had a false eye. Some of these situations were contained within a log he maintained over the years.

¶ 19. As to Chitwood, Peskie observed that he was "extremely relaxed" despite the circumstances. He was "on the nod," meaning that he appeared to be sleeping but, in fact, was conscious and alert. In other words, his body was "so relaxed" that his eyes were closed. Chitwood had a delayed verbal response to questions Peskie posed. When Chitwood did respond, his speech was slow and slurred. His voice was thick, low, and raspy. His pupils were constricted to two millimeters when, in normal light, they should have been between two-and-one-half and five millimeters. As medical personnel attended to Chitwood, scrubbing his lacerations and stapling his forehead, he did not make any sounds or any movements and neither his pulse nor his blood pressure were elevated.[3] In Peskie's experience, when a person was involved in a crash and

---

[3] During cross-examination, Peskie clarified that Chitwood's pulse was "slightly above normal" but what he "would

in the presence of law enforcement, typically that person's pulse and blood pressure were elevated. When asked, Chitwood acknowledged that he was taking Percocet. Based on these observations, as well as Essinger's observations at the scene and the crash, Peskie concluded that Chitwood was under the influence of a narcotic analgesic such as oxycodone.

¶ 20. Peskie also concluded that Chitwood was under the influence of a central nervous system depressant such as a muscle relaxer or an antidepressant. This conclusion was based on Chitwood's relaxed demeanor, delayed response, and lethargic movements, as well as HGN and VGN checks of his eyes. Peskie observed that Chitwood had a "lack of smooth pursuit in his left and right pupil," a "distinct and sustained nystagmus at maximum deviation in his left and right pupil," and a VGN.[4] A HGN, Peskie testified, was caused by a central nervous system depressant, an inhalant, or a dissociate anesthetic such as PCP, the latter of which was "extremely rare." Chitwood stated he was taking Soma and that he ingested the Soma and Percocet around 3:00 a.m., and again sometime that morning.

¶ 21. It was Peskie's opinion that as a result of being under the influence of a narcotic analgesic and a central nervous system depressant, Chitwood was incapable of operating a motor vehicle safely.

¶ 22. On cross-examination, Peskie testified that that he did not conduct three steps in the protocol. Peskie did not conduct a breath alcohol test because Chitwood was bleeding from his mouth. Peskie also did

---

consider normal." Normal, Peskie said, was sixty to ninety beats per minute, and Chitwood's pulse "started at 114 but ended at 94."

[4] Peskie was unable to perform a lack of convergence test.

not conduct the Rhomberg test, the walk-and-turn test, the one-leg stand test, and the finger-to-nose test. Finally, Peskie did not conduct two of the three pupil size tests, one in near total darkness, and the other in direct light.

## *Jury Instructions*

¶ 23. In its charge to the jury on opinion evidence, the court stated as follows:

> Ordinarily a witness may testify only about facts, however, a witness with expertise in a particular field may give an opinion in that field. In determining the weight to give this opinion, you should consider the qualifications and credibility of the witness, the facts upon which the opinion is based and the reasons given for the opinion. Opinion evidence was received to help you reach a conclusion, however, you are not bound by any expert's opinion.

> Ordinarily a witness may testify only about facts, however, in this case former deputy sheriff Eric Essinger was allowed to give an opinion that Defendant Andrew Chitwood was not able to operate a motor vehicle in a safe manner and Investigator Nathan Peskie was allowed to give an opinion that Defendant, Andrew Chitwood, was under the influence of a narcotic analgesic and a central nervous system depressant and was incapable of operating a motor vehicle safely.

> In determining the weight you give to these opinions, you should consider the witness' opportunities to observe what happened and the extent to which the opinions are based upon those observations. Opinion evidence was received to help you reach a conclusion, however, you are not bound by the opinion of any witness.

> During the trial an expert witness was told to

145

assume certain facts and then was asked for an opinion based on that assumption. This is called a hypothetical question. The opinion does not establish the truth of the facts upon which it is based. Consider the opinion only if you believe the assumed facts upon which it is based have been proved.

## The Verdict and Sentence

¶ 24. The jury found Chitwood guilty of both charges of operating a motor vehicle while under the influence of drugs and after revocation. The court sentenced Chitwood to a five-year prison sentence, consisting of two years of initial confinement and three years of extended supervision on the operating while under the influence of drugs count. Chitwood appeals.

## Contentions

¶ 25. Chitwood contends that Peskie's opinion testimony was scientific evidence and, thus, had to meet the *Daubert* test, now codified in WIS. STAT. §§ 907.01 and 907.02. It was scientific because "[t]he drug recognition evaluation protocol is technical and involves specialized information beyond an average person's, and even an average police officer's, intelligence." For example, the blood alcohol test, the HGN and VGN tests, the lack of convergence of pupils test, the vital signs exam, and the toxicologist analysis "are all based on medical science." Chitwood acknowledges that portions of the evaluation are not based on medical science, nevertheless, data derived from the scientific portions of the protocol heavily inform the officer's final analysis.

¶ 26. Alternatively, Chitwood argues that the evaluation is based on "specialized knowledge," which

also requires application of *Daubert*. This is so because, as Peskie testified, drug recognition evaluators receive advanced training beyond that of the "average" law enforcement officer. Peskie's opinion was based on a partial evaluation and, therefore, inadmissible under *Daubert*. While Peskie testified that his training and recertification included instances where all twelve steps were not completed, the State never presented any evidence that an incomplete drug recognition protocol is reliable. For example, there was no evidence of "general acceptance of an incomplete drug recognition protocol, no operational safeguards, no evidence about the error rate of an incomplete protocol, no specialized literature mentioning an incomplete protocol nor any evidence that an incomplete protocol has been submitted to peer review, or any laboratory corroboration."

¶ 27. The State responds that the circuit court did not erroneously exercise its discretion in admitting Peskie's opinion testimony. The State agrees with Chitwood's alternative argument, that Peskie's testimony was based on specialized knowledge, making it subject to Wis. Stat. § 907.02. The State submits that Peskie's testimony was correctly admitted into evidence because the principles and methods underlying the drug recognition evaluation protocol have been tested, published, subjected to peer review, and accepted by courts as reliable. Where, as here, there are reliable principles underlying the expert's opinion, but there may have been some error in application, such as an incomplete test, *Daubert* favors leaving such matters to cross-examination and the determination of the jury.

## ANALYSIS

*The Text of* WIS. STAT. *§ 907.02*

¶ 28. In January 2011, the legislature amended WIS. STAT. § 907.02, making expert testimony admissible under the *"Daubert* reliability standard embodied in Federal Rules of Evidence 702." *State v. Giese,* 2014 WI App 92, ¶ 17, 356 Wis. 2d 796, 854 N.W.2d 687 (citation omitted). The amended statute provides as follows:

> **(1)** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

Sec. 907.02(1).

*The Daubert Standard*

¶ 29. Under the *Daubert* standard, the function of the circuit court is to serve as a "gate-keeper" so as "to ensure that the expert's opinion is based on a reliable foundation and is relevant to the material issues." *Giese,* 356 Wis. 2d 796, ¶ 18; *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The *Daubert* test makes "certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. To this end, discussed more fully below, a circuit court may consider a number of factors. *Id.* at 149–50, 152. The *Daubert* "standard is flexible but has teeth." *Giese*, 356 Wis. 2d 796, ¶ 19. Its "goal is to prevent the jury from hearing conjecture dressed up in the guise of expert opinion." *Id.*

*Standard of Review*

¶ 30. The decision whether to admit or exclude expert testimony is reviewed under an erroneous exercise of discretion standard. *Id.*, ¶ 16. The circuit court's determination will be upheld if it "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. In this regard, we are "highly deferential" to the circuit court's determination. *Id.*, ¶ 29. The question is not whether we would have permitted the evidence to come in or whether we agree with the circuit court's ruling, but whether, in fact, appropriate discretion was exercised. *Id.*

*Background of Drug Recognition*
*Evaluation (DRE) Protocol*

¶ 31. The DRE protocol "is a nationally standardized protocol for identifying drug intoxication based upon a program first designed by the Los Angeles Police Department." *State v. Daly*, 775 N.W.2d 47, 57 (Neb. 2009). It is based on the well-established concept that drugs cause observable signs

and symptoms, affecting vital signs and changing the physiology of the body. *Id.* at 58, 61. The DRE protocol is used in all fifty states and the District of Columbia. *See* THE INTERNATIONAL DRUG EVALUATION AND CLASSIFICATION PROGRAM, http://www.decp.org/about (last visited Mar. 22, 2016). The DRE protocol is used to make three determinations: whether or not the suspect is behaviorally impaired; if so, whether the impairment relates to drugs or a medical condition; and, if drugs, then what category or combination of categories of drugs are the likely cause of impairment. *See* THE INTERNATIONAL DRUG EVALUATION AND CLASSIFICATION PROGRAM, http://www.decp.org/experts/12steps.htm (last visited Mar. 22, 2016). The twelve steps of the DRE protocol are as follows:

1. *Breath Alcohol Test*

The arresting officer reviews the subject's breath alcohol concentration (BrAC) test results and determines if the subject's apparent impairment is consistent with the subject's BrAC. If so, the officer will not normally call a DRE. If the impairment is *not* explained by the BrAC, the officer requests a DRE evaluation.

2. *Interview of the Arresting Officer*

The DRE begins the investigation by reviewing the BrAC test results and discussing the circumstances of the arrest with the arresting officer. The DRE asks about the subject's behavior, appearance, and driving. The DRE also asks if the subject made any statements regarding drug use and if the arresting officer(s) found any other relevant evidence consistent with drug use.

3. *Preliminary Examination and First Pulse*

The DRE conducts a preliminary examination, in large part, to ascertain whether the subject may be suffering

from an injury or other condition unrelated to drugs. Accordingly, the DRE asks the subject a series of standard questions relating to the subject's health and recent ingestion of food, alcohol and drugs, including prescribed medications. The DRE observes the subject's attitude, coordination, speech, breath and face. The DRE also determines if the subject's pupils are of equal size and if the subject's eyes can follow a moving stimulus and track equally. The DRE also looks for horizontal gaze nystagmus (HGN) and takes the subject's pulse for the first of three times. The DRE takes each subject's pulse three times to account for nervousness, check for consistency and determine if the subject is getting worse or better. If the DRE believes that the subject *may* be suffering from a significant medical condition, the DRE will seek medical assistance immediately. If the DRE believes that the subject's condition is drug-related, the evaluation continues.

### 4. *Eye Examination*

The DRE examines the subject for HGN, vertical gaze Nystagmus (VGN) and for a lack of ocular convergence. A subject lacks convergence if his eyes are unable to converge toward the bridge of his nose when a stimulus is moved inward. Depressants, inhalants, and dissociative anesthetics, the so-called "DID drugs", may cause HGN. In addition, the DID drugs may cause VGN when taken in higher doses for that individual. The DID drugs, as well as cannabis (marijuana), may also cause a lack of convergence.

### 5. *Divided Attention Psychophysical Tests*

The DRE administers four psychophysical tests: the Romberg Balance, the Walk and Turn, the One Leg Stand, and the Finger to Nose tests. The DRE can accurately determine if a subject's psychomotor and/or divided attention skills are impaired by administering these tests.

151

### 6. *Vital Signs and Second Pulse*

The DRE takes the subject's blood pressure, temperature and pulse. Some drug categories may elevate the vital signs. Others may lower them. Vital signs provide valuable evidence of the presence and influence of a variety of drugs.

### 7. *Dark Room Examinations*

The DRE estimates the subject's pupil sizes under three different lighting conditions with a measuring device called a pupilometer. The device will assist the DRE in determining whether the subject's pupils are dilated, constricted, or normal. Some drugs increase pupil size (dilate), while others may decrease (constrict) pupil size. The DRE also checks for the eyes' reaction to light. Certain drugs may slow the eyes' reaction to light. Finally, the DRE examines the subject's nasal and oral cavities for signs of drug ingestion.

### 8. *Examination for Muscle Tone*

The DRE examines the subject's skeletal muscle tone. Certain categories of drugs may cause the muscles to become rigid. Other categories may cause the muscles to become very loose and flaccid.

### 9. *Check for Injection Sites and Third Pulse*

The DRE examines the subject for injection sites, which may indicate recent use of certain types of drugs. The DRE also takes the subject's pulse for the third and final time.

### 10. *Subject's Statements and Other Observations*

The DRE typically reads *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)], if not done so previously, and asks the subject a series of questions regarding the subject's drug use.

152

11. *Analysis and Opinion of the Evaluator*

Based on the totality of the evaluation, the DRE forms an opinion as to whether or not the subject is impaired. If the DRE determines that the subject is impaired, the DRE will indicate what category or categories of drugs may have contributed to the subject's impairment. The DRE bases these conclusions on his training and experience and the DRE Drug Symptomatology Matrix. While DREs use the drug matrix, they also rely heavily on their general training and experience.

12. *Toxicological Examination*

After completing the evaluation, the DRE normally requests a urine, blood and/or saliva sample from the subject for a toxicology lab analysis.

THE INTERNATIONAL DRUG EVALUATION AND CLASSIFICATION PROGRAM, *supra.*

*The DRE Protocol is Subject to WIS. STAT. § 907.02(1)*

¶ 32. The parties do not dispute that, at the very least, Peskie's testimony was based on "specialized knowledge," and we agree. We need not attempt to go further and try to differentiate between "scientific knowledge" and "specialized knowledge," as Chitwood would have us do, because in either case testimony based thereon would be subject to WIS. STAT. § 907.02(1). Moreover, it would be a daunting task, maybe even an "impossible" one, to try and distinguish between the two because "[t]here is no clear line that divides the one from the others." *Kumho*, 526 U.S. at 148; *see City of West Bend v. Wilkens*, 2005 WI App 36, ¶ 21, 278 Wis. 2d 643, 693 N.W.2d 324 ("Scientific evidence involves highly technical or *specialized* information beyond the ken of the average person's general knowledge.") (emphasis added).

¶ 33. Generally, the first eleven steps conducted by the drug recognition evaluator are based on a combination of (1) physical tests, such as the HGN, VGN, vital signs, and muscle tone; (2) the gathering of information, such as the report of an arresting officer and the defendant's statements regarding drug use; and (3) the drug recognition officer's own observations of the defendant's behavior, appearance and driving, including the divided attention and coordination tests, all in light of his or her training and experience. As Peskie recounted in his testimony, he underwent specialized training in order to be certified as a drug recognition evaluator. His testimony was clearly based on "specialized" knowledge, beyond that of the average person, even beyond that of the average law enforcement officer. *See Kumho*, 526 U.S. at 149 (noting that expert's testimony often rests upon an experience confessedly foreign in kind to that of the jury) (citation omitted); *see also United States v. Everett*, 972 F. Supp. 1313, 1320–21 (D. Nev. 1997) (although decided before *Kumho*, the court concluded that the DRE protocol was not scientific and, thus, not subject to *Daubert*, but the DRE protocol was "based upon observation, training and experience," which the court characterized at times as "technical" or "specialized"); *State v. Aleman*, 194 P.3d 110, 116–17 (N.M. Ct. App. 2008) (holding that the DRE protocol is based upon specialized knowledge). Chitwood has never challenged Peskie's training, experience or qualifications.

¶ 34. Since Peskie's testimony was based on specialized knowledge and, thus, subject to WIS. STAT. § 907.02(1), the circuit court erred when it concluded that § 907.02 and *Daubert* did not apply. Nevertheless, we may affirm the circuit court if it reached the correct

result but for the wrong reason. *State v. Morgan*, 195 Wis. 2d 388, 443, 536 N.W.2d 525 (Ct. App. 1995) ("this court will generally probe for reasons to sustain a trial court's discretionary ruling").

## *The DRE Protocol is Reliable*

¶ 35. In *Daubert*, the U.S. Supreme Court provided an illustrative, nonexhaustive list of factors a court might consider in deciding whether the proposed expert testimony based upon scientific, technical, or other specialized knowledge is reliable: whether the theory or technique employed by the expert is generally accepted in the relevant community; whether it has been subject to peer review and publication; whether it has been tested; and whether the known or potential rate of error is acceptable. *Kumho*, 526 U.S. at 149–50; *Daubert*, 509 U.S. at 593–94. Proponents of the expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." FED. R. EVID. 702 advisory committee's note to 2000 amendments (citation omitted).

¶ 36. The DRE protocol has been the subject of several published studies and peer reviews, which indicate that it is a sufficiently valid methodology for identifying if a person is impaired by drugs.

¶ 37. In the 1980's, a field study conducted by the Los Angeles Police Department and the National Highway Traffic Safety Administration, known as the Compton study, compared the opinions of drug recognition evaluators with the toxicological analysis of blood

155

samples of 173 subjects. RICHARD P. COMPTON, FIELD EVALU-ATION OF THE LOS ANGELES POLICE DEPARTMENT DRUG DETEC-TION PROGRAM, U.S. DEP'T OF TRANSP., D.O.T. H.S. 807 012, at 8 (1986), http://ntl.bts.gov/lib/31000/31300/31317/6465_807–012_FieldEvalLAPD.pdf. The Compton study found that the drug recognition evaluators were correct ninety-four percent of the time when claiming a suspect had drugs other than alcohol in his or her system. *Id.* at 22. Drug recognition evaluators were able to identify at least one drug other than alcohol in eighty-seven percent of the suspects evaluated in the study. *Id.* When a drug recognition evaluator identified a suspect as impaired by a specific drug, the drug was detected in the suspect's blood seventy-nine percent of the time. *Id.*

¶ 38. In a 1984 study conducted by Johns Hopkins University in conjunction with the National Highway Traffic Safety Administration, it found that the DRE protocol "showed a high degree of accuracy in correctly identifying the drug classes which had been administered to those subjects judged to be intoxicated." GEORGE E. BIGELOW, ET AL., IDENTIFYING TYPES OF DRUG INTOXICATION: LABORATORY EVALUATION OF A SUBJECT-EXAMINATION PROCEDURE, U.S. DEP'T OF TRANSP., D.O.T. H.S. 806 753, at 16 (1984), http://ntl.bts.gov/lib/25000/25700/25712/DOT-HS-806–753.pdf. Among the subjects judged to be intoxicated, the correct drug class was identified almost ninety-two percent of the time. *Id.* Almost ninety-nine percent of the time, where a subject had been judged intoxicated, the subject had received some active drug. *Id.*

¶ 39. In a 1992 study by the National Highway Traffic Safety Administration, it reviewed 1842 drug recognition evaluations conducted between 1987 and

1991 in ten different localities. D.F. PREUSSER, ET AL., EVALUATION OF THE IMPACT OF THE DRUG EVALUATION AND CLASSIFICATION PROGRAM ON ENFORCEMENT AND ADJUDICATION, U.S. DEP'T OF TRANSP., D.O.T. H.S. 808 058, at 18 (1992), http://ntl.bts.gov/lib/25000/25800/25838/DOT-HS-808–058.pdf. In ninety-two percent of those evaluations, or 1711 times, the drug recognition evaluator reached the opinion that the suspect was under the influence of one or more of the seven drug classes. *Id.* at 19. Laboratory testing confirmed that the drug recognition evaluator's opinion was correct eighty-four percent of the time. *Id.* at 20. When a drug recognition evaluator opined on the specific drug ingested, the evaluator was correct sixty-four percent of the time. *Id.* at 20–21.

¶ 40. The State of Arizona, in 1994, conducted a validation study, retrieving the records of five-hundred persons over a fifty-three month period who were suspected of driving while impaired by drugs. EUGENE V. ADLER & MARCELLINE BURNS, DRUG RECOGNITION EXPERT (DRE) VALIDATION STUDY, ARIZONA GOVERNOR'S OFFICE OF HIGHWAY SAFETY, at 16 (1994), http://decp.us/pdfs/Adler_1994_DRE_validation_study.pdf. The authors of the study compared the opinions of the drug recognition evaluators against the laboratory's analysis for the presence of drugs and found that the drug recognition evaluators were cor-rect nearly eighty-four percent of the time. *Id.* at 33. Further, "the number of false positive opinions . . . were low," meaning the number of times a drug recognition evaluator predicted the presence of a drug but which the laboratory technician did not find. *Id.* at 32, 52.[5]

---

[5] In one article, the author was highly critical of the studies conducted by Richard P. Compton, George E. Bigelow, and Eugene V. Adler. Greg Kane, *The Methodological Quality*

¶ 41. In a 1996 study, researchers conducted a double-blind laboratory study, using eighteen volunteers and twenty-eight drug recognition evaluators. Stephen J. Heishman, et al., *Laboratory Validation Study of Drug Evaluation and Classification Program: Ethanol, Cocaine, and Marijuana*, 20 J. OF ANALYTICAL TOXICOLOGY 468, 469 (Oct. 1996), http://jat.oxfordjournals.org/content/20/6/468.full.pdf.[6] The volunteers were given one active drug—alcohol, cocaine, or marijuana—and three placebos. *Id.* at 469–70. The DRE protocol used "was an abridged version" in that evaluators were not permitted to question the volunteers about recent drug use or to interrogate them in order to solicit an admission about drug use. *Id.* at 470. The evaluators were told that the study might involve ethanol and five classes of drugs, that all combinations of ethanol and those drugs could be administered, and that on some sessions, subjects would receive no active drug. *Id.* at 469. During the course of the research, 158 valid drug recognition evaluations were conducted, resulting in eighty-one cases where the evaluator concluded impairment was present. *Id.* at 475. Of these eighty-one impairment predictions, toxicology was positive for any drug ninety-two percent of the time, and the evaluator's prediction was consistent with the drug type found by toxicology testing approximately fifty-one percent of

*of Three Foundational Law Enforcement Drug Influence Evaluation Validation Studies,* J. OF NEGATIVE RESULTS IN BIOMEDICINE, (Nov. 2013), http://jnrbm.biomedcentral.com/articles/10.1186/1477–5751–12–16#CR4.

[6] The Journal of Analytical Toxicology is a peer-reviewed international publication according to its website. *See* JOURNAL OF ANALYTICAL TOXICOLOGY, http://jat.oxfordjournals.org/ (last visited Mar. 22, 2016).

the time, which fell to forty-four percent when alcohol was excluded. *Id.* at 475, 480.

¶ 42. In a 1998 study by the same researchers, they used a similar procedure but gave the volunteers either alprazolam, *d*-amphetamine, codeine or marijuana. Stephen J. Heishman, et al., *Laboratory Validation Study of Drug Evaluation and Classification Program: Alprazolam, d-Amphetamine, Codeine, and Marijuana,* 22 J. OF ANALYTICAL TOXICOLOGY 503, 504 (Oct. 1998), http://jat.oxfordjournals.org/content/22/6/503.full.pdf. The results of the study showed that when the drug recognition evaluators concluded volunteers were impaired, "their drug-class decisions were consistent with the administration of any active drug in 76% of cases, but consistent with toxicology in only 32% of cases." *Id.* at 512–13. The false-positive rate, depending on the drug, was described as "very low," "relatively low," or "lower than the false-negative rate." *Id.* at 508–10. Again, false positive was defined as when a drug recognition evaluator identified a volunteer as having received a drug when, in fact, the volunteer had not received a drug. *Id.* at 506. The researchers found that "the predictive efficiency of the model for each drug . . . ranged from 73 to 90, indicating a moderate to high degree of predictive validity." *Id.* at 512. All of this led the researchers to conclude that drug recognition evaluators "are able to detect drug-induced impairment in general, but have difficulty discriminating between various drugs." *Id.* at 513. The researchers concluded that the DRE protocol "is a valid test to identify recent drug use." *Id.*

¶ 43. Explaining the results of the two Heishman studies, the *Daly* court said,

> [T]o the extent the Heishman studies indicate a

higher rate of error than the studies relied upon by the State, that risk is mitigated by the fact that an erroneous DRE evaluation will probably err on the side of the suspect. The risk of a false positive is low. Any risk is mitigated further by the fact that identifying the specific drug that caused a driver's impairment is inessential—the DUI statute [like Wisconsin, *see* WIS. STAT. 346.63(1)(a)] only requires proof that the defendant was under the influence of "any drug" and does not require the drug to be identified by the arresting officer. And finally, we note that the final step in the DRE protocol is the use of chemical testing to confirm the officer's evaluation.

*Daly*, 775 N.W.2d at 61.

¶ 44. These various studies demonstrate that the potential rate of error of the DRE protocol in determining whether a suspect is impaired by drugs is acceptable, with varying lesser degrees of accuracy as to the specific type of drug. *See id.* at 58–59 (stating that based on the studies discussed above, "every court to have considered the issue has concluded that testimony based upon the DRE protocol is admissible into evidence").[7] The theory behind the protocol can be

---

[7] In both Heishman studies, the researchers offered reasons why their rates of predictability were lower than in the field. Stephen J. Heishman, et al., *Laboratory Validation Study of Drug Evaluation and Classification Program: Ethanol, Cocaine, and Marijuana*, 20 J. OF ANALYTICAL TOXICOLOGY 468, 480–81 (Oct. 1996); Stephen J. Heishman, et al., *Laboratory Validation Study of Drug Evaluation and Classification Program: Alprazolam, d-Amphetamine, Codeine, and Marijuana*, 22 J. OF ANALYTICAL TOXICOLOGY 503, 513 (Oct. 1998). One reason offered was that the drug recognition evaluators were not permitted to question the volunteers, which precluded admissions of drug use. The *Daly* court criticized the Heishman studies for just this reason. *State v. Daly*, 775 N.W.2d 47, 60 (Neb. 2009).

tested and has received adequate scrutiny in the relevant community. Notably, Chitwood does not even dispute that, when used in its entirety, the DRE protocol is reliable. Nor does Chitwood challenge the reliability of any individual step in the DRE protocol. Rather, he contends that the State failed to show that a DRE protocol when incompletely employed is capable of producing a reliable result.

*Peskie's Testimony was Properly Admitted*

¶ 45. We hold that the circuit court did not erroneously exercise its discretion in allowing Peskie's testimony into evidence. It is undisputed that the DRE protocol is reliable, particularly when it comes to determining impairment by drugs. Here, the toxicology report confirmed the presence of oxycodone, citalopram, and carisoprodol. Thus, that certain studies show lower levels of accurate assessments as to the specific drugs taken is irrelevant here, because the toxicology report confirmed Peskie's identification of the categories of drugs ingested by Chitwood.

¶ 46. Moreover, while in this instance Peskie was unable to complete all twelve steps of the DRE protocol, this did not, as he testified, preclude him from coming to a conclusion based on the tests he conducted that Chitwood was impaired by drugs. As Peskie testified, "ideal[ly]" all twelve steps would be completed. But, we deal in realities, not idealities. It is a reality that where a driver is impaired by drugs, there may be many reasons why a drug recognition evaluator cannot complete the entire DRE protocol. The suspect may have been injured in an accident, have a physical condition, or be so impaired that he or she

cannot perform some of the tests. *See* International Association of Chiefs of Police, *Drug Recognition Expert Course (DRE) 7–Day School,* HS 172 R5/13 ed., http://www.wsp.wa.gov/breathtest/docs/webdms/ DRE_Forms/Manuals/dre7/ParticipantManual%20 (DRE%207–Day)%20–May%202013%20(49MB).pdf (last visited Mar. 22, 2016) (noting that there may be times, because of injuries, an uncooperative suspect, or equipment failure, that a drug recognition evaluator will be unable to complete each step of the evaluation).[8] But, the drug recognition evaluator, if he or she is able, can still come to a conclusion on the suspect's impairment by drugs based on those tests that were able to be completed.

¶ 47. Namely, here, the other portions of the test already confirmed what Peskie knew or would come to know. Take, for example, the breath alcohol test. The toxicology test did not show the presence of alcohol in Chitwood's blood. Peskie's inability to conduct that test, because Chitwood had blood in his mouth, had no effect on Peskie's conclusion, because Chitwood had not been ingesting alcohol. Peskie did not conduct two of the three pupil tests but he had already observed that Chitwood had constricted two millimeter pupils, a sign of a narcotic analgesic. *See id.* (stating that subjects under the influence of narcotic

---

[8] Suppose a suspect had ingested enough central nervous system depressants that he was extremely drowsy and on the verge of passing out, making him unable even to attempt a divided attention psychophysical test. Yet, if a drug recognition evaluator was otherwise able to assess the suspect's impairment, it being obvious that the suspect was impaired, under Chitwood's argument, the drug recognition evaluator's opinion would be inadmissible. This is the logical extension of Chitwood's argument.

analgesics will generally have constricted pupils below three millimeters in diameter).

¶ 48. Even Peskie's inability to conduct the range of divided attention psychophysical tests did not render his conclusion unreliable. He had multiple other indicators that Chitwood's ability to drive the vehicle safely was impaired by drugs, such as Chitwood's extremely relaxed state, delayed verbal responses, lethargic movement, and slurred speech. Police officers routinely opine regarding a defendant's ability to drive safely based on personal observations of the defendant's behavior, appearance and driving, along with their training and experience. As the circuit court noted, these observations of a defendant's ability to function where divided attention and coordinative abilities is required need not be tested or subject to peer review in order to be deemed reliable and admissible.

¶ 49. In short, Peskie had sufficient evidence before him, based on the steps he was able to conduct, to reliably conclude that Chitwood was behaviorally impaired by drugs. *See id.* (listing some of the observable effects of a narcotic analgesic as slow and raspy speech, inability to concentrate, constricted pupils, droopy eyelids, decreased pulse and blood pressure, and, for a central nervous system depressant, thick slurred speech, delayed response and lethargic movements, droopy eyes, decreased pulse and blood pressure, HGN and, in cases of high doses, VGN).[9] These effects of impairment directly observed by Peskie,

---

[9] The court of appeals of Minnesota concluded in an unpublished decision that there was a sufficient foundation to admit a drug recognition evaluator's opinion even though all twelve steps were not completed. *State v. Cammack*, No. C5–96–1000, 1997 WL 104913 (Minn. Ct. App. Mar. 11, 1997).

along with the behavioral impairment observed by Essinger, were consistent with the toxicological results, and ultimately, the likely evidence of impairment identified by Schreiber given the levels of drugs found in Chitwood's blood in the toxicological tests.

¶ 50. Peskie's determination may have been "more reliable" if he had been able to conduct the entire examination, but we are satisfied that his determination was sufficiently reliable based on those tests he was able to conduct. *See Giese*, 356 Wis. 2d 796, ¶ 28. Anything beyond that was outside the province of the court—to admit or not—and better left for defense counsel to challenge during cross-examination. *See id.*[10]

### Remaining Contention

¶ 51. In light of our decision upholding the circuit court's admission of Peskie's testimony, we need not reach the State's argument that any error in admitting Peskie's testimony was harmless. *See State v. Bustamante*, 201 Wis. 2d 562, 577, 549 N.W.2d 746 (Ct. App. 1996).

## CONCLUSION

¶ 52. The circuit court did not err in admitting Peskie's drug recognition opinion testimony into evi-

---

[10] Chitwood cross-examined Peskie on the impact of Chitwood's injuries on his evaluation. While defense counsel elicited Peskie's testimony that he did not know Chitwood's "medical diagnosis," Peskie testified that he was told by the technicians there was no loss of consciousness and that Chitwood was not given any medication. He also testified that he performed tests for signs of head injuries. Chitwood does not develop an argument that Peskie's analysis of medical issues rendered the circuit court's admission of Peskie's partial evaluation an erroneous exercise of discretion.

■■■■■

■■■■

dence under WIS. STAT. § 907.02(1). Peskie's expertise based on his specialized and extensive knowledge, experience and training is unchallenged. The DRE protocol, particularly as it relates to identifying drug-induced impairment, is the product of reliable principles and methods. The error rate for determining some sort of drug impairment is acceptable. The DRE protocol has been tested, published, and peer-reviewed, receiving adequate scrutiny in the relevant field. It is widely accepted and in use in the law enforcement community. Other courts have accepted it as reliable. Peskie applied the DRE protocol reliably to the facts of Chitwood's case. Peskie had sufficient facts upon which to base his opinion, and the evidence of behavioral impairment that he observed was consistent with the toxicological results. Accordingly, we affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.