STATE OF MAINE                    UNIFIED CRIMINAL DOCKET
KENNEBEC, SS.                     AUGUSTA
                                  DOCKET NO. CR-2016-638


STATE OF MAINE

V.                               **ORDER ON MOTION TO SUPPRESS**

EDSON WILSON

### INTRODUCTION

The matter before the court is the Defendant's Motion to Suppress evidence and statements obtained from him by law enforcement on March 20, 2016 in Augusta. Specifically, the Defendant seeks to suppress (1) statements he made after he had invoked his right to counsel following *Miranda* warnings; (2) the results/opinions, including any observations, of the drug impairment assessment performed on him by a certified drug recognition expert, and; (3) the results of any chemical test on a urine sample he provided to the police.

An evidentiary hearing was held on the motion on February 17, 2017 at which Officer Anthony Drouin of the Augusta Police Department testified. State's Exhibit 1, a DVD of the time Defendant and Officer Drouin were in the booking room after a breath test had been administered, was admitted without objection.[1] Defendant's Exhibit 1, being Officer Drouin's 5-page Drug Influence Evaluation report, was also admitted without objection.

---

[1] Defense Counsel provided a written transcript of the DVD to the court. The State agreed that the court could use the transcript as an aid in viewing the DVD. The court attempted to view the DVD but was unable to do so on its MacBook laptop. The court sought the assistance of the State's Attorney in order to view the DVD, but he too was unable to view the disc on the court's laptop. Ultimately, the court was able to view the entire DVD on its home computer.

The parties submitted memoranda of law, with the last one being received by the court on March 31, 2017. On April 21, 2017 the court issued a Procedural Order requesting the parties to provide their positions as to whether additional testimony and/or briefing was needed in light of the information in Defendant's Exhibit 1 that Officer Drouin had read the so-called "Implied Consent Form" to the Defendant. Neither party addressed the potential relevance of this during Officer Drouin's testimony, or in their post-hearing memoranda, on the question of the Defendant's consent to providing a urine sample. The Defendant responded to the court's Procedural Order and argued that the information in the report referring to the reading of the "Implied Consent Form" should not be considered by the court or, alternatively, that the reading of the "Implied Consent Form" did not constitute a valid and voluntary consent for the taking of the Defendant's urine sample. The State did not respond in writing to the court's Procedural Order.

Based upon the evidence presented at the hearing, and after consideration of the parties' written arguments, the court makes the following factual findings.

## FACTS

On March 20, 2016, as the sun was setting, Officer Drouin responded to the scene of a motor vehicle accident on Eastern Avenue in Augusta. The scene was "chaotic" according to Officer Drouin because it was rush hour. Upon arriving at the scene Drouin learned that a pick-up truck had gone off the road and come to rest in the woods. The operator of the vehicle was the Defendant, Edson Wilson.

The paramedics, who had examined the Defendant, told Officer Drouin that he appeared under the influence and Drouin himself observed that the Defendant's pupils were "restricted," which he knew to be an indicator of drug use. The officer decided to have the Defendant perform some field sobriety tests. While at the roadside scene, and before he was taken into custody, the Defendant made a statement to the effect that he had been to the methadone clinic.

As a result of the Defendant's performance on the field sobriety tests, the officer saw signs of impairment and decided to take him to the police department to administer a breath test. The Defendant was handcuffed and placed in the rear of the cruiser. During the ride, the Defendant mentioned that the feelings of methadone came in "waves" and that he usually pulls over when that happens. He also said that he had used pot. Officer Drouin asked no follow-up questions during the ride because he had not yet read the Defendant any *Miranda* warnings.

According to Officer Drouin's report (Defendant's Exhibit 1), upon arrival at the police department he read the "Implied Consent Form" to the Defendant, who then performed a breath test.[2] The breath test produced a result of .00 grams of alcohol per 210 liters of breath. (*Defendant's Exhibit 1*). Officer Drouin was of the opinion that the Defendant's level of impairment did not match the test result. Accordingly, he decided that he needed a urine sample from the Defendant. He also decided to conduct a drug influence evaluation since he is a certified drug recognition expert. *See* 29-A M.R.S. §2526. It appears that the officer and the Defendant moved to a different room, which is when the video on the DVD begins.

Regarding obtaining a urine sample, Officer Drouin and the Defendant had the following initial exchange:

Officer: So are you going to have to pee?
Wilson: What?
Officer: Are you going to have to pee soon?
Wilson: I'll try. If I have to.
Officer: Do you want to try right now?
Wilson: I am going to wait. I don't have to pee right now. We'll wait.

---

[2] The reading of the "Implied Consent Form" and the administration of the breath test are not included in the DVD admitted into evidence and viewed by the court. The form itself was not offered or admitted into evidence and no testimony concerning it or its reading was elicited at the hearing.

Officer Drouin gave the Defendant a bottle of water, allowed him to make a call to his mother, and then read him the *Miranda* warnings. At the end of the recitation of rights, the Defendant clearly invoked his right to counsel. Officer Drouin had the Defendant sign the *Miranda* card and then stated: "Alright, so I do have to ask you a couple of questions, but it is just medical stuff . . . . make sure that you are not having a medical issue." It is apparent from the context of the conversation between the officer and the Defendant that the officer was about to begin his drug influence evaluation. Around this time Officer Drouin remarked: "So we are gonna be stuck here until you pee, so . . . drink as much water as you can."

Officer Drouin asked the Defendant a series of questions pertaining to his physical health, such as whether he was diabetic or epileptic, whether he was sick or injured, whether he took insulin, whether he had any physical deficits and whether he was under the care of a physician or dentist. The Defendant responded in the negative to all of the questions, except that he told the officer that "I go to the methadone clinic every morning" in Waterville.

Officer Drouin took the Defendant's pulse (multiple times), temperature, blood pressure and muscle tone, and performed the horizontal gaze nystagmus examination. He had the Defendant perform several field sobriety tests including the "one-leg stand," the "walk and turn," the "finger to nose" and the "Romberg Modified Balance" examination that required the Defendant to estimate the passage of 30 seconds in his head, apparently to assess whether his "internal clock" was either fast or slow. Officer Drouin formed the opinion that the Defendant was under the influence of depressants, narcotic analgesics and cannabis.

During the course of the drug influence evaluation, Officer Drouin again told the Defendant: "I need you to pee in the cup." The Defendant responded: "I'll pee." Officer Drouin accompanied and observed the Defendant while he voided

4

into a cup. There was further conversation between Officer Drouin and the Defendant during which the Defendant expressed surprise that he was being charge with OUI, and he took the officer up on his offer to explain why. As the officer was speaking, the Defendant stated that he took a Clonapin yesterday and methadone today. In his report, Officer Drouin noted that he could smell the odor of burnt marijuana on the Defendant's breath.

While the officer was on the phone, apparently talking to the jail about the Defendant's bail, the Defendant spontaneously remarked that "I did methadone, it's not against the law." He made a further spontaneous comment to the effect that he believed he could "take my methadone and drive."

## DISCUSSION

### A. Motion to Suppress Statements

One part of the Defendant's motion to suppress pertains to statements he made to Officer Drouin on the evening of March 20, 2016. As an initial matter, it does not appear that the Defendant is contesting the admissibility of statements he made to the officer at the roadside scene before he was taken into custody. Nor does he appear to be challenging statements he made while handcuffed and seated in the rear of the cruiser en route to the Augusta Police Department. If, however, the Defendant is seeking to suppress those statements, the motion is denied. The statements made at the roadside scene were made at a time when the Defendant was not subjected to custodial interrogation and appear to have been spontaneously made by him. Similarly, the statements made during the ride to the police station were volunteered by the Defendant and were not in response to any questioning by Officer Drouin. *See State v. Simoneau,* 402 A.2d 870, 873 (Me. 1979).

The focus of the Defendant's motion as it relates to statements, is on questions asked of him by Officer Drouin as part of the drug influence evaluation after the Defendant had received *Miranda* warnings and had invoked his right to

5

counsel. There can be no doubt, and the court explicitly finds, that the Defendant clearly invoked his right not to answer questions until he had spoken to his attorney.

Nevertheless, the officer asked a series of questions pertinent to conducting the drug influence evaluation. The Defendant contends that those questions, even though they did not seek an admission or confession to the offense and were intended to determine whether the defendant was a medically and/or physically suitable candidate to undergo such an evaluation, should be excluded because the officer acknowledged that the answers to those questions could assist in the OUI investigation of the Defendant.

In *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980) the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Thus, in this case, the officer's question to the Defendant as to whether he was under the care of a physician or dentist, and the Defendant's response that he attended the methadone clinic every day in Waterville, is excluded from evidence at the trial in the State's case in chief. With respect to that question and answer, Officer Drouin knew or should have known that it was reasonably likely to elicit an incriminating response. The court is not suggesting that the officer was intending to elicit such a response. Rather, the officer was trying to obtain enough medical information from the Defendant to determine whether, and to what extent, he could undergo a drug influence evaluation.

The broader issue is whether all the questions asked by Officer Drouin that related to the Defendant's medical and physical condition should be excluded on *Miranda* grounds because they constituted custodial interrogation. The court

concludes that, other than the question referred to above, the questions asked of the Defendant by Officer Drouin were neutral questions that were not reasonably likely to elicit an incriminating response and did not amount to custodial interrogation. The medical questions themselves have no probative or evidentiary value other than to assess whether there were reasons a drug recognition examination (DRE) could not be performed.

> The DRE protocol "is a nationally standardized protocol for identifying drug intoxication based upon a program first designed by the Los Angeles Police Department." It is based on the well-established concept that drugs cause observable signs and symptoms, affecting vital signs and changing the physiology of the body. The DRE protocol is used in all fifty states and the District of Columbia. The DRE protocol is used to make three determinations: whether or not the suspect is behaviorally impaired; if so, whether the impairment relates to drugs or a medical condition; and, if drugs, then what category or combination of categories of drugs are the likely cause of impairment.

*State v. Chitwood*, 2016 WI. App 36, ¶ 31, 879 N.W.2d 786 *quoting State v. Daly*, 278 Neb. 903, 775 N.W.2d 47, 57 (2009). (Other citations omitted).

The Maine Legislature has provided that a "drug impairment assessment" conducted by a certified drug recognition expert, is admissible. 29-A M.R.S. §§2525 and 2526. *See also State v. Atkins*, 2015 ME 162, ¶¶ 13-18, 129 A.3d 952.

As noted above, the DRE protocol and the evaluation/assessment performed by a certified drug recognition expert is focused on objectively observable signs and symptoms. This is true even of the Romberg Modified Balance test which, along with the "walk and turn," the "one leg stand" and the "finger to nose" tests, "determine if a subject's psychomotor and/or divided attention skills are impaired by administering these tests." *State v. Chitwood*, 2016 WI App 36, ¶ 31.

The court concludes that the questions used to administer the drug influence assessment do not constitute custodial interrogation. Moreover, the spontaneous

statements made by the Defendant while Officer Drouin was on the phone to the jail are admissible. Except as otherwise stated earlier in this Order, the Defendant's motion to suppress statements is denied.

### B. Motion to Suppress Drug Impairment Assessment

The Defendant contends that the drug impairment assessment to which he was subjected, and which is statutorily authorized by 29-A M.R.S. §2525(1), was an unreasonable search of his person that was unduly invasive. Specifically, the Defendant asserts that he was essentially subjected to a medical examination when Officer Drouin asked him medical information, felt for his muscle tone, took his pulse and blood pressure and examined his eyes.

Initially, the court rejects the Defendant's argument that the officer lacked articulable suspicion to conduct the drug impairment assessment. Based on the factual information known to the officer, he clearly had probable cause to believe that the Defendant had operated his motor vehicle while under the influence of intoxicants, i.e. drugs.

Moreover, using the analysis of the Supreme Court in *Birchfield v. North Dakota,* ____U.S.____, 136 S. Ct. 2160 (2016), this court concludes that the drug impairment assessment is a permissible warrantless search incident to arrest for driving while intoxicated. In short, "[t]he impact of [a drug impairment assessment] on privacy is slight, and the need for [such] testing is great." 136 S. Ct. at 2184.

The Defendant's motion to suppress the drug impairment assessment is denied.

### C. Motion to Suppress Urine Sample

In *Birchfield* the Supreme Court held that a warrantless breath test is a permissible search incident to arrest for drunk driving. A blood test, however, may not be conducted in the absence of a warrant, exigent circumstances or consent. In

8

drawing this distinction within the context of searches incident to arrest, the Court applied the analysis used in *Riley v. California*, ___U.S.___, 134 S. Ct. 2473, 2185 (2014) that balances "'on the one hand, the degree to which it [a search incident to arrest] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Birchfield*, 136 S. Ct. at 2176.

In considering the impact of breath and blood tests on individual privacy interests, the Court looked at three factsors, namely: (1) the extent of the physical intrusion upon the individual; (2) the extent to which the evidence obtained from the individual could be preserved and examined for additional, unrelated private information, and; (3) the extent to which the individual's participation in the search would enhance the embarrassment of the arrest. 136 S. Ct. at 2176-77.

The Court found that breath tests involved "an almost negligible" physical intrusion. *Id.* at 2176. Second, the breath sample provided only information pertaining to the amount of alcohol in a subject's breath and nothing was left in the possession of law enforcement. Finally, participation in the process of a breath test, i.e., blowing into a tube, involved no further embarrassment beyond that inherent in the arrest itself. *Id.* at 2177.

The Court held that "[b]lood tests are a different matter." *Id.* at 2178. A blood test involves piercing the skin and extracting a sample of bodily fluid. While the pain involved may be relatively minor, it is "significantly more intrusive than blowing into a tube." *Id.* Finally, by virtue of a blood test the police are left in possession of a blood sample from which other highly personal information could be obtained, even if the police are only permitted to use the sample for purposes of the determining blood alcohol content.

The Court reaffirmed its longstanding holding that the government has a "paramount interest . . . . in preserving the safety of public highways." *Id. quoting*

*Mackey v. Montrym,* 443 U.S. 1, 17 (1979). Balancing the government's "paramount interest" with the impact on individual privacy, the Court held that the 4th Amendment "permits warrantless breath tests incident to arrest for drunk driving," but not for blood tests because the taking of blood is "significantly more intrusive." 136 S. Ct. at 2184.

Of relevance for purposes of this case is the fact that the Supreme Court expressly did not decide whether the taking of a urine sample was a permissible warrantless search incident to arrest for driving while intoxicated. 136 S. Ct. at 2168, n. 1. The issue before this court, therefore, is whether a urine sample is more like a breath test or more like a blood test under the *Birchfield* analysis.

The Defendant has supplied the court with a copy of the decision of the Minnesota Supreme Court in *State v. Thompson,* 886 N.W.2d 224 (Minn. 2016) in which the court applied the *Birchfield* analysis in the context of a urine sample.

First, the *Thompson* court held that a urine sample "is more similar to a breath test than a blood test" in terms of the "physical intrusion" involved. Providing a urine sample does not require piercing the skin or extracting bodily fluids with a needle. Moreover, like breathing, urination is an inevitable and natural process. 886 N.W.2d at 230.

Because law enforcement is left in the possession of a urine sample, which has the potential of detecting private health information beyond alcohol and drug concentrations, the *Thompson* court found that"[t]he taking of a urine sample, . . . , raises the same privacy concerns that the Court addressed in *Birchfield* with regard to blood tests." *Id. at 231.*

Finally, the court in *Thompson* found that "[c]ompared to blood testing, which does not involve an arrestee performing a private bodily function in front of law enforcement, urine testing involves a much greater privacy invasion in terms

10

of embarrassment. This factor therefore strongly indicates that urine testing implicates weighty privacy concerns." *Id.* at 232.

After balancing the privacy interests of the individual arrestee against the state's "paramount interest" in maintaining highway safety, the Minnesota Supreme Court concluded:

> Based on our analysis, we hold that a warrantless urine test does not qualify as a search incident to a valid arrest of a suspected drunk driver. Such tests significantly intrude upon an individual's privacy and cannot be justified by the State's interests given the availability of less-invasive breath tests that may be performed incident to a valid arrest.

*Id.* at 233.

The court is unaware of any case, other than *Thompson,* that has applied the *Birchfield* analysis to a urine sample. *But see Bailey v. State,* 790 S.E.2d98, 104 (Ga. App. 2016)(vacating trial court's admission of results of blood and urine samples taken from unconscious suspect without a warrant and citing *Birchfield* and *McNeely v. Missouri,* ____U.S.____, 133 S. Ct. 1552 (2013)).

Based on its examination of *Birchfield,* and the reasoning of the Minnesota Supreme Court in *Thompson,* the court is persuaded that if the United States Supreme Court and/or the Maine Law Court were to directly address the issue, they would hold that the warrantless taking of a urine sample would <u>not</u> be permitted under the 4th Amendment as a search incident to arrest, absent exigent circumstances or consent. The State's argument that a urine sample is more akin to a breath test than a blood sample is the same argument advanced by the State of Minnesota in *Thompson,* and rejected by the court there.

The State makes the additional argument that in the context of drug OUI cases, a urine sample is the least invasive alternative, pointing to the Supreme Court's language in *Birchfield* that the reasonableness of blood tests "must be

11

judged in light of the availability of the less invasive alternative of a breath test." 136 S. Ct. at 2184. The argument was raised in *Birchfield* that blood tests are necessary because breath tests only detect alcohol, not other substances that can impair the operator of a motor vehicle. The Supreme Court's response was the following:

> . . . . but police have other measures at their disposal when they have reason to believe that a motorist may be under the influence of some other substance (for example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood). Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not.
> *Id.*

Thus, the remedies available to the police when seeking a urine sample from a driver who is suspected of having driven while impaired on drugs is to seek a warrant, obtain consent or demonstrate that exigent circumstances exist that justifies a warrantless search and seizure of the sample.

The State has not suggested that exigent circumstances existed in this case. The State has, however, asserted that the Defendant's urine sample was obtained with his consent.

Consent is a recognized exception to the warrant requirement, if it is freely and voluntarily given. It is the State's burden, by a preponderance of the evidence, to show "that an objective manifestation of consent was given by word or gesture." *State v. Boyd,* 2017 ME 36, ¶ 10, ____A.3d _____, *quoting State v. Bailey,* 2012 ME 55, ¶ 16, 41 A.3d 535. In meeting this burden, the State must show "more than mere 'acquiescence to a claim of lawful

12

authority.'" *State v. Cress*, 576 A.2d 1366, 1367 (Me. 1990) *citing and quoting Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).

Based on the evidence presented at the hearing in this matter, the court is not persuaded that the State has met its burden of proving a voluntary consent on the part of the Defendant to the taking of a urine sample from him. The State did not present any evidence concerning the circumstances of the Defendant's alleged consent. It did not elicit any testimony about the reading of the "Implied Consent Form."[3] No evidence of consent was part of the DVD provided to the court as State's Exhibit 1. For all the court can tell from viewing the DVD, the Defendant's agreement to produce a urine sample was his acquiescence to Officer Drouin's statement that a urine sample was required/needed. In short, the court is not satisfied that the State has demonstrated that the Defendant objectively manifested his voluntary consent to the taking of a sample of his urine.

The Defendant's motion to suppress his urine sample is granted.

## CONCLUSION

The entry is:

Defendant's Motion to Suppress is GRANTED in part and DENIED in part.

Dated: May 15, 2017

William R. Stokes
Justice, Superior Court

---

[3] Since no evidence about the circumstances of the reading of the "Implied Consent Form" was ever presented, the court has no occasion to decide whether the Defendant's response to that reading constituted a voluntary consent. *See State v. Lemeunier-Fitzgerald*, 2016 Me. Super. LEXIS 170 (August 22, 2016)(Marden, J.) *appeal pending*.

13