CITY OF WEST BEND, Plaintiff-Respondent,

v.

Richard B. WILKENS, Defendant-Appellant.

Court of Appeals

*No. 04–1871. Submitted on briefs November 26, 2004.—Decided January 12, 2005.*

2005 WI App 36

(Also reported in 693 N.W.2d 324.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Waring R. Fincke* of West Bend.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Elizabeth A. Krueger*, assistant city attorney.

¶ 1. BROWN, J. This case involves a question of admissibility versus weight of the evidence. Richard B. Wilkens, convicted of operating a vehicle with a prohibited alcohol concentration, complains that the field sobriety tests (FSTs) the arresting officer administered were unreliable because they failed to conform to the standardized procedures approved by the United States Department of Transportation's National Highway Traffic Safety Association. The trial court determined that the reliability of the tests was for the jury to decide. We agree that the procedures the officer employed go to the weight of the evidence, not its admissibility. We reject Wilkens' attempt to cast this case as one involving the use of scientific evidence, the reliability of which this court must determine before the fact finder may consider it. FSTs are not scientific tests. They are merely observational tools that law enforcement officers commonly use to assist them in discerning various indicia of intoxication, the perception of which is necessarily subjective. Moreover, it is not beyond the ken of the average person to understand such indicia and to form an opinion about whether an individual is intoxi-

cated. The evidence was not without probative value and therefore was admissible.

¶ 2. The material facts in this case are not contested. They are as follows: Kenneth G. Onken, a city of West Bend police officer, worked the midnight shift on November 4, 2002. While operating his radar detector on Creek Road at approximately 2:00 a.m., he observed a motorcycle traveling fifty miles per hour. This speed exceeded the legal speed limit by twenty miles per hour, so Onken stopped the vehicle. When he approached the driver of the motorcycle, Wilkens, Onken noticed several signs of intoxication: red, glassy eyes, the odor of alcohol, Wilkens' admission that he had consumed a few beers at a local tavern, and slurred speech.

¶ 3. Because of these indicia of intoxication, Onken asked Wilkens to perform FSTs. He administered the three tests outlined in the West Bend police department's FST policy: (1) the alphabet test, (2) the finger-to-nose test, and (3) the heel-to-toe walk, in that order. Wilkens failed all three.

¶ 4. Based on Wilkens' performance on the FSTs, Onken requested a preliminary breath test. The sample indicated a blood alcohol concentration of .13 percent. Onken arrested Wilkens for operating a motor vehicle while under the influence of an intoxicant and transported him to St. Joseph's Hospital for a blood draw. The results of this test revealed a blood alcohol concentration of .19 percent.

¶ 5. Two citations resulted from this encounter, each for a separate violation of a municipal ordinance that adopts Wis. Stat. § 346.63 (2003–04),[1] "Operating under influence of intoxicant or other drug." One vio-

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless indicated otherwise.

lation was for operating his vehicle while under the influence of an intoxicant to the extent that he was incapable of safe driving. *See* § 346.63(1)(a). The other cited him for operating with a PAC. *See* § 346.63(1)(b).

¶ 6. Proceedings for this case began in the Mid-Moraine Municipal Court. Wilkens moved to suppress from use at trial all of the following evidence: (1) testimony by Onken relating to his administration of the FSTs and his interpretation of Wilkens' performance; (2) the PBT results; (3) all of Wilkens' postarrest statements and Onken's observations of Wilkens; and (4) the blood draw results. Wilkens argued as follows: the court could not consider Onken's administration of the three FSTs or Wilkens' performance of them because they were not scientifically reliable. Wilkens asserts that the three-test battery approved by NHTSA—the horizontal gaze nystagmus (HGN), walk and turn (WAT), and one-leg stand (OLS)—"is the only scientifically validated and reliable method for discriminating between impaired and unimpaired drivers."[2] He observes that NHTSA specifically rejected the use of the finger-to-nose test and tests similar to the alphabet test as unreliable. Moreover, Wilkens points out, Onken's administration of the heel-to-toe test did not follow the NHTSA protocol for the administration of WAT, which requires standardized administration and grading of various clues in order to reliably distinguish passing and failed performance. By contrast, he notes that Onken relied upon his own subjective assessment of Wilkens' performance.

¶ 7. Wilkens' argument continued: without the FSTs, Onken had no probable cause to request a PBT. Without the FST and PBT, Wilkens contends Onken also had no probable cause for the arrest. According to

---

[2] Wilkens quotes NHTSA's FST instructor manual.

Wilkens, Onken's pre-FST observations did not rise to the requisite level of suspicion to satisfy the probable cause standard for either the PBT or the arrest. Thus, Wilkens concludes the court should also suppress the fruits of both.

¶ 8. The record contains no ruling on the suppression motion, but it is clear that the case proceeded to trial on December 18, 2003. The trial resulted in findings of guilt on both charges, and the court entered final judgment on January 9, 2004. Wilkens appealed to the Washington County Circuit Court.

¶ 9. Wilkens renewed his attempt to suppress all evidence Onken obtained subsequent to his administration of the FSTs. The trial court held a hearing on this suppression motion on May 14. Onken testified for the City, and Jeffrey Barber, a former law enforcement officer certified in FSTs, testified on behalf of Wilkens. Barber was familiar with several NHTSA studies with respect to the reliability of various FSTs.

¶ 10. At the conclusion of this hearing, the court denied Wilkens' motion. The court declined to mandate any particular combination or method of administering FSTs, opining that common sense plays a role in an officer's observations. It further opined that it is a jury question whether a person met the requisite level of impairment or whether alternative explanations were more persuasive. The parties could inform the jury's decision by questioning the officer's methods and presenting testimony about their reliability. The court found that probable cause existed, based on Wilkens' slurred speech, red and glassy eyes, the odor of intoxicants, and his admission to having been drinking, combined with his performance on the FSTs. With respect to the latter, the court paid special attention to Wilkens' balance problems and the fact that he not only

recited the alphabet incorrectly but failed even to realize his mistake.

¶ 11. On May 18, the parties tried the case on stipulated facts. Citing Wilkens' performance on the FSTs, his speeding, and his high alcohol level as revealed by the blood test, the trial court found Wilkens guilty on both tickets but dismissed the violation based on Wis. Stat. § 346.63(1)(a), driving under the influence of an intoxicant. Wilkens now appeals the order denying his suppression motion and the judgment of conviction on the § 346.63(1)(b) PAC violation.

¶ 12. The main thrust of Wilkens' appeal focuses on the purported unreliability of the FSTs. On the surface, he appears to raise a probable cause issue, i.e., this court should suppress the PBT results and all postarrest evidence because both the administration of the PBT and the arrest lacked probable cause. However, the sole basis for his claim that probable cause was lacking is his assertion that "Onken's FSTs were unreliable and his observations of and conclusions he drew from Wilkens' performance on the tests *should be excluded* from the probable cause analysis." Ultimately, he challenges the fact that the trial court even considered the FST evidence. Thus, his argument hinges upon whether the trial court erred in admitting the evidence.

¶ 13. The admissibility of evidence is within the trial court's discretion. *State v. Peters*, 192 Wis. 2d 674, 685, 534 N.W.2d 867 (Ct. App. 1995). We will not overturn its decision absent an erroneous exercise of such discretion. *Id.* The trial court is within its discretion so long as it examined the relevant facts, applied a proper legal standard, and reached a conclusion that a reasonable judge could reach through a demonstrated rational process. *Id.*

¶ 14. In Wisconsin, the general standard for admissibility is very low. Generally, evidence need only be relevant to be admissible. *See* WIS. STAT. § 904.02; *State v. Eugenio*, 219 Wis. 2d 391, 411, 579 N.W.2d 642 (1998) ("All relevant evidence is admissible unless otherwise provided by law."). Evidence is relevant when it is probative of any material fact. WIS. STAT. § 904.01 (Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Even Wilkens does not argue that Onken's observations of his performance on the FSTs utterly lacked probative value. Certainly, when an officer—particularly one with sixteen years of law enforcement experience and who makes an average of four OWI arrests each month—determines that a driver fails not one but *three* FSTs, it is more probable that the person has an illegal blood alcohol concentration than if the officer determined he or she passed the tests. We cannot conclude that the trial court erred in considering the evidence.

¶ 15. Wilkens believes that the general rules for admissibility do not apply in this case. He attempts to characterize FSTs as scientific tests. He states: "These [FSTs] are tests, not lay observations as the City contends. When you test someone, it implies some scientific or measurable basis for determining something." Given his focus on the reliability of these tests, we understand him to argue that scientific evidence must be reliable before a court may admit and consider the evidence.

¶ 16. Although it is true that the rules of evidence sometimes require the exclusion of otherwise relevant and admissible evidence for policy reasons unrelated to

probativeness, *see State v. St. George*, 2002 WI 50, ¶ 82, 252 Wis. 2d 499, 643 N.W.2d 777 (Sykes, J., concurring) (citing hearsay, character evidence, and evidence protected by privilege as examples), we reject Wilkens' argument on two grounds. First, FSTs are not "scientific tests." Second, even if they were, reliability is not a prerequisite to admitting scientific evidence in this state.

¶ 17. We turn first to the allegedly "scientific" nature of FST observations. Despite Wilkens' assertions to the contrary, the FSTs that Onken administered are not "scientific." Indeed, the fact that Onken relied on his own subjective judgment—one of Wilkens' major complaints in citing why the tests were flawed—in deciding whether Wilkens passed or failed indicates that there was no "science" whatsoever in forming his conclusions. Onken testified that his purpose in administering FSTs is to determine whether a suspect can follow directions and whether the person can divide his or her attention and exhibit fine motor skills. One can perceive any of these abilities and conclude that their impairment is an indicator of intoxication without employing a scientific test. FSTs simply give an officer an opportunity to look for such indicia. They are observational tools, not litmus tests that scientifically correlate certain types or numbers of "clues" to various blood alcohol concentrations.

¶ 18. Further, we remain unconvinced by the proposition that following the standardized procedures that NHTSA recommends leads to scientifically valid determinations.[3] Barber gave ·the following testi-

---

[3] The HGN test attempts to correlate eye movement with the person's level of intoxication. Jerkiness in eye movements is not a commonly known indicator of intoxication. Moreover, it

mony: (1) NHTSA has recommended only HGN, WAT, and OLS as "reliable indicators" of either impairment or intoxication; (2) a correlation exists between arrest decisions based on those three tests and whether the test subject actually has a blood alcohol level in excess of the legal limit; (3) when an officer deviates from the standardized procedures, NHTSA considers the result "invalid"; and (4) the standardized procedures require an officer to look for specific "clues" in assessing satisfactory performance versus failure.

■

¶ 19. Other than the bare assertion that the recommended standardized tests are both scientifically reliable and valid, the record contains no indication that they are based on science. Any scientific explanation for *why* the standardized procedures yield any particular result is completely absent. Standardization may lead to reliability in the sense that where examiners look for the same "clues" to shape their observations of the subject, their observations are likely to be more similar. Similarity does not equate to more correct observations, however. "The mere fact that the NHTSA studies attempted to quantify the reliability of the field sobriety tests in predicting unlawful [blood alcohol contents] does not convert all of the observations of a person's performance into scientific evidence." *State v. Meador*, 674 So. 2d 826, 831–32 (Fla. Dist. Ct. App. 1996). The evidence before us simply does not allow us to conclude that following the NHTSA protocol yields scientifically correct results. For this reason, we will not treat Onken's observations with respect to Wilkens'

was not among the tests Onken administered. Thus, our discussion here should not be read to pass on whether that test has a scientific basis.

performance of the FSTs any differently from his other subjective observations of Wilkens, i.e., his red and glassy eyes, slurred speech, his speeding, and the smell of alcohol on his person.

¶ 20. We note that other courts and commentators have remained similarly unconvinced that FST observations are based on science. The *Meador* court stated that, with the exception of observations with respect to the HGN test, a police officer's observations of FST performance should be "placed in the same category as other commonly understood signs of impairment, such as glassy or bloodshot eyes, slurred speech, staggering, flushed face, labile emotions, odor of alcohol or driving patterns." *Id.* at 832. The court in *United States v. Horn*, 185 F. Supp. 2d 530 (D. Md. 2002), also faced the issue of whether observations resulting from the administration of FSTs were admissible evidence. In that case, the court wrote:

> There is no factual basis before me to support the NHTSA claims of accuracy for the WAT and OLS tests or to support the conclusions about the total number of standardized clues that should be looked for or that missing a stated number means the subject failed the test. There is very little before me that suggests that the WAT and OLS tests are anything more than standardized procedures police officers use to enable them to observe a suspect's coordination, balance, concentration, speech, ability to follow instructions, mood and general physical condition—all of which are visual cues that laypersons, using ordinary experience, associate with reaching opinions about whether someone has been drinking.

*Id.* at 558. Moreover, as one commentator points out, the WAT and OLS tests have only "face validity"; this level of validity is the lowest possible, and generally

academia does not accept it because it "rests on the investigator's *subjective evaluation* of the appropriateness of the instrument for measuring the concept rather than whether the instrument measures what the researcher wishes to measure." Mimi Coffey, *DWI: Modern Day Salem Witch Hunts*, THE CHAMPION, Nov. 2004, at 51, 52 (emphasis added) (citation omitted).

¶ 21. Finally, even if science "validates" observations that police officers make when administering FSTs, that would not mean the observations themselves are based on scientific phenomena rather than plain common sense. Normally, scientific evidence involves highly technical or specialized information beyond the ken of the average person's general knowledge. Courts admit expert testimony in order to help the finder of fact understand and apply this information. Ordinary individuals are readily familiar with the manifestations of alcohol consumption, both physical and mental. They do not need to hear expert testimony about how to discern drunkenness. Moreover, they know intuitively that a PAC and drunkenness often accompany each other. They do not need "scientific evidence" to tell them so any more than they require an explanation of the theory of gravity in a suit where a plaintiff claims to have been injured by a fallen object.

¶ 22. Even if we were to conclude that Onken's observations during the FSTs were scientific evidence, the alleged unreliability of these tests would not necessarily render the evidence inadmissible. Wilkens' contrary assumption appears to presuppose an admissibility standard similar to that which the federal courts employ. This standard, which the United States Supreme Court announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), assigns federal judges a significant gatekeeping role over scien-

tific evidence. "[U]nder the [Federal Rules of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but *reliable." Id.* at 589 (emphasis added). However, Wisconsin is not a *Daubert* state. *See Peters,* 192 Wis. 2d at 687.

¶ 23. Wisconsin, unlike the federal courts, considers the reliability of scientific evidence a question of weight and credibility for the trier of fact to decide. *Id.* at 690. A party can challenge the reliability of such evidence through cross-examination or other means of impeachment. *Id.* The evidence is admissible as long as it is relevant, the witness testifying to such evidence is a qualified expert, and the evidence will assist the fact finder in understanding the evidence or determining some factual issue. *Id.* at 687–88. Wilkens has not challenged the trial court's consideration of the FST evidence on any of these grounds.

¶ 24. We hold that nothing precluded the trial court from considering Onken's testimony about what he observed when he administered the FSTs to Wilkens. The reliability of this evidence was totally irrelevant for purposes of its admissibility. We are unconvinced that this evidence was scientific rather than a commonsense observation made possible by means of observational tools—the FSTs. Because the evidence has probative value, the general standards for admissibility call for its admission. Moreover, even if the evidence was based on science, Wisconsin is not a *Daubert* state. Hence, an admissibility challenge premised exclusively on the unreliability of the observations misses the mark.

*By the Court.*—Judgment and order affirmed.