COURT OF APPEALS
DECISION
DATED AND FILED

May 3, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1406-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CT94**

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

 V.

ERIC TRYGVE KOTHBAUER,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Chippewa County: STEVEN R. CRAY, Judge. *Affirmed*.

¶1 GILL, J.[1] Eric Kothbauer appeals from a judgment, entered following a jury trial, convicting him of operating a motor vehicle with a prohibited alcohol concentration (PAC), as a second offense. Kothbauer also

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

appeals from an order denying his motion for postconviction relief. He argues that his defense counsel[2] was ineffective for failing to: (1) move to suppress the results of the Standard Field Sobriety Tests (SFSTs) and blood draw obtained after an alleged unlawful search turned the traffic stop into an unlawful arrest; (2) focus more at trial on the alleged unlawful search and seizure; (3) move to suppress the blood draw based on the lack of probable cause to arrest because the SFSTs were incorrectly administered; (4) focus more at trial on the arresting officer's alleged noncompliance with the National Highway Traffic Safety Administration's DWI Detection and Standardized Field Sobriety Testing Manual (NHTSA Manual); (5) move to admit a specific dash camera video into evidence; and (6) move to admit Kothbauer's medical records into evidence. Kothbauer also asserts that the circuit court erred when it denied his postconviction motion without conducting a *Machner*[3] hearing. For the reasons stated below, we reject Kothbauer's arguments and therefore affirm.

¶2 First, we conclude that defense counsel's failure to file a motion to suppress the SFSTs and blood draw was not prejudicial, nor was defense counsel's failure to focus more on the alleged unlawful search prejudicial. We also conclude that defense counsel did not perform deficiently by failing to file a motion to suppress the blood draw. Further, defense counsel's failure to focus more on the arresting officer's alleged noncompliance with the NHTSA Manual was not prejudicial to Kothbauer. Nor was defense counsel's failure to present the dash camera video to the jury prejudicial. In addition, defense counsel was not

---

[2] We refer to Kothbauer's attorney at the circuit court level as "defense counsel."

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

prejudicial for failing to seek admission of Kothbauer's medical records into evidence. Lastly, even assuming Kothbauer's factual allegations are true, the record conclusively demonstrates that defense counsel was not ineffective and, therefore, the circuit court was properly acting within its discretion by denying Kothbauer's postconviction motion without a ***Machner*** hearing.

## BACKGROUND

¶3 Shortly after 2:00 a.m. on March 23, 2016, Officer Michael Checkalski pulled Kothbauer over for failing to stop his vehicle at a stop sign and for conducting an illegal turn. After making contact with Kothbauer, Checkalski explained why he had stopped Kothbauer. Despite this explanation, the criminal complaint stated that Kothbauer stared at Checkalski for approximately ten seconds and then asked why he was being pulled over. According to the complaint, Checkalski could smell a "slight odor of intoxicants" coming from the car. Kothbauer admitted to having consumed three alcoholic drinks that night, and Checkalski observed that Kothbauer exhibited slowed speech and glassy eyes. Checkalski testified at trial that based on these observations, in conjunction with the driving violations that warranted the initial stop, he asked Kothbauer to step out of the car. The complaint stated that Kothbauer twice asked why he had to get out of the car, but eventually he did so at Checkalski's continued request. At that point, there was one other officer at the scene of the traffic stop.

¶4 Once out of the car, Checkalski asked Kothbauer to take his hands out of his front coat pockets. He also asked Kothbauer if he had "consent to pat down [Kothbauer's] front pockets for any weapons." Kothbauer gave Checkalski permission to perform a pat down search. Rather than conducting a pat down, however, Checkalski put his hands directly into Kothbauer's pockets. Therein,

Checkalski found "multiple" chewing tobacco tins but nothing of evidentiary value regarding a criminal offense.[4]

¶5     After the search, Checkalski had Kothbauer perform SFSTs. The first test was the horizontal gaze nystagmus (HGN) test. Checkalski observed a lack of smooth pursuit in both of Kothbauer's eyes as well as distinct and sustained nystagmus at maximum deviation in both eyes.[5] Prior to performing the walk and turn (WAT) test, Kothbauer informed Checkalski that he had balance issues due to injuries he had sustained during his military service in Iraq and he did not want to perform the WAT test. According to the criminal complaint, Checkalski stated that Kothbauer did not have to perform the WAT test and that there were other tests that could be done.

¶6     Checkalski then had Kothbauer perform the one leg stand (OLS) test. Checkalski observed that Kothbauer began the test before being instructed to do so, brought his foot down five times, used his arms to balance himself, and was swaying from side to side. At that point, there were four police officers at the scene. Lastly, Checkalski asked Kothbauer if he wanted to perform the alphabet exercise. Kothbauer accepted, and he correctly recited the section of the alphabet that Checkalski requested.

----

[4] At some point prior to the search, Kothbauer twice told Checkalski that he had some "chew" in his pants pockets.

[5] Checkalski's original police report from March 23, 2016, was lost or misplaced sometime between that night and April 8, 2016. He subsequently rewrote the report sometime between April 8, 2016 and April 15, 2016, to which we cite throughout this opinion. It was this latter report that was used to refresh Checkalski's recollection at trial.

¶7 Once the tests were complete, Checkalski asked Kothbauer to perform a preliminary breath test (PBT). Kothbauer did not submit to a PBT,[6] and he was placed under arrest. The entire incident was captured on Checkalski's dash camera video.

¶8 A subsequent blood draw was performed after Kothbauer gave consent. The results showed that Kothbauer had a 0.127 blood alcohol concentration (BAC). The State charged Kothbauer with one count of operating while intoxicated (OWI) and one count of PAC, both as second offenses.

¶9 Kothbauer was appointed defense counsel, who filed a motion to suppress Kothbauer's statements made during the traffic stop allegedly in violation of *Miranda*.[7] Following a hearing, the circuit court denied the motion to suppress, concluding that Kothbauer's statements were not made during a "custodial interrogation" as defined in *Miranda*. The court subsequently denied Kothbauer's motion for reconsideration.

¶10 The case proceeded to a jury trial without defense counsel filing any motions in limine regarding the admission of Kothbauer's medical records. Following voir dire, but prior to opening statements, defense counsel for the first time inquired with the circuit court "what can come in and what can't" regarding Kothbauer's medical records for the purpose of questioning his performance on

---

[6] There is a dispute about whether Kothbauer refused to submit to a PBT, refused to answer the officer's request, was delayed in answering the officer, or accepted doing a PBT too late. In any event, he did not do a PBT. The circuit court did not make a factual finding as to this matter. Whether he affirmatively refused the test is not relevant to our analysis, and we therefore will not address the "refusal" further.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

the SFSTs. The court responded, "there's an understanding that what he told the officer that night will be admissible but that any statements about" doctors' opinions would not be admissible because of hearsay issues and a lack of foundation. Defense counsel responded that he "obviously has the [doctors'] reports, but [not] a doctor or any—anybody here to lay a foundation on that." He was therefore barred from presenting any of Kothbauer's medical records to the jury.

¶11 After opening statements, the State called Checkalski. Checkalski testified regarding his training in administering SFSTs and Kothbauer's performance of them. On cross-examination, defense counsel's questioning focused on whether the SFSTs were done in conformity with the research supporting the tests and with Checkalski's training. Neither party played the dash camera video for the jury. The State also called an expert who testified to, among other things, how the body processes alcohol.

¶12 Kothbauer also testified at trial. On direct, he answered questions about how Checkalski asked for his consent to conduct a pat down to look for weapons, but that instead of doing the pat down, Checkalski immediately "dove his hands in my pocket and dug around and pulled things out." Kothbauer said that Checkalski's conduct made him "furious." Kothbauer also testified that he informed Checkalski about his balance issues due to his injuries sustained in Iraq.

¶13 During its closing argument, the State pointed out that the defense did not provide any "real proof [of Kothbauer's injuries] other than" Kothbauer's testimony that he had injuries that could affect his performance on the SFSTs. Defense counsel's closing argument directed the jury's attention to the fact that Checkalski knew about Kothbauer's injuries and still subjected him to the SFSTs

that would be affected by his injuries. Defense counsel also focused on how the human body absorbs and eliminates alcohol and argued for the application of a blood alcohol curve defense.[8] Ultimately, the jury returned verdicts of not guilty on the OWI charge and guilty on the PAC charge. Kothbauer was later sentenced to ten days' jail, twelve months' license revocation, placement of an ignition device for twelve months and fined $1,464.

¶14 Kothbauer filed a motion for postconviction relief, asserting that he had been denied his constitutional right to the effective assistance of counsel. The circuit court denied the motion without holding a *Machner* hearing.

¶15 Kothbauer now appeals, arguing that his defense counsel was ineffective and that the circuit court erred when it denied his postconviction motion without an evidentiary hearing. Additional facts are included below.

## DISCUSSION

¶16 Whether Kothbauer's defense counsel was constitutionally ineffective presents a mixed question of law and fact. *State v. McDowell*, 2004

---

[8] The blood alcohol curve does not have a precise definition, but has been described by this court in the past:

> [A] person goes through three stages of processing alcohol: absorption, plateau, and elimination. These stages can be represented on a graph as a curve with the alcohol content rising until it peaks and then falling as the body eliminates the alcohol. Thus, a person who is in the process of absorbing alcohol may be under the legal limit while driving but subsequently exceed the limit when a test is taken.

*State v. Brown*, No. 2016AP83-CR, unpublished slip op. ¶5 (WI App Dec. 14, 2016); *see also* WIS JI—CRIMINAL 234 (2004).

WI 70, ¶31, 272 Wis. 2d 488, 681 N.W.2d 500. We will not disturb the circuit court's findings of fact unless they are clearly erroneous, but whether defense counsel's performance was constitutionally ineffective is a question of law we review de novo. *Id.*

¶17     A defendant seeking relief for ineffective assistance of counsel must show both that defense counsel's representation was deficient and that the deficiency was prejudicial. *Id.*, ¶19; *see also* ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, a defendant "must show that counsel's conduct fell below an objective standard of reasonableness." ***State v. Champlain***, 2008 WI App 5, ¶20, 307 Wis. 2d 232, 744 N.W.2d 889. To show prejudice, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland***, 466 U.S. at 694. A "reasonable probability" is one that undermines confidence in the outcome, *id.*, which "exists when there is a 'substantial,' not just 'conceivable,' likelihood of a different result." ***State v. Cooper***, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (citation omitted). If a court finds that one of the two ineffective assistance requirements is not met, it need not address the other. ***Strickland***, 466 U.S. at 697.

## I.  Unlawful search and seizure

¶18     Kothbauer first contends that his defense counsel was ineffective for failing to move to suppress evidence derived from an unlawful seizure. He argues that Checkalski's search of his pockets exceeded the scope of what is permissible in a pat down search and, therefore, the detention was transformed into an arrest and that he was seized without probable cause. According to Kothbauer, the proper remedy for the illegal search of his person and the resulting seizure is to

suppress any evidence obtained after the search—including the results of the SFSTs and blood draw—under the exclusionary rule.

¶19 We assume without deciding that the search of Kothbauer's pockets was unconstitutional. To determine if the exclusionary rule applies to the evidence obtained after the pocket search, we must determine whether Kothbauer was placed under arrest at the time of the search or whether he was merely being detained for purposes of investigation under the ***Terry*** doctrine.[9] *See **State v. Anker***, 2014 WI App 107, ¶15, 357 Wis. 2d 565, 855 N.W.2d 483. "The standard used to determine the moment of arrest is whether a reasonable person in the defendant's position would have considered himself or herself to be in custody given the degree of restraint under the circumstances." ***Id.*** (citation omitted). The subjective intent of the officers and the suspect does not matter for the arrest inquiry. ***State v. Swanson***, 164 Wis. 2d 437, 446-47, 475 N.W.2d 148 (1991), *abrogated on other grounds by **State v. Sykes***, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d 277.

¶20 Kothbauer argues that he considered himself in custody at the time Checkalski searched his pockets for several reasons: (1) he understood that the search of his pockets could only be done lawfully after he was arrested; (2) he was surrounded by four law enforcement officers; (3) he was told he could not leave; and (4) he suffers from a traumatic brain injury, making him more "vulnerable

---

[9] ***Terry v. Ohio***, 392 U.S. 1 (1968).

than others."[10]  Under an objective analysis, we conclude that a reasonable person in Kothbauer's position would not have believed he or she was in custody at the time.

¶21  In a similar case, this court considered the reasonableness of law enforcement's detention of a defendant, a suspected intoxicated driver, to determine if he was under arrest or whether he was being temporarily detained under *Terry*.  *See State v. Quartana*, 213 Wis. 2d 440, 445, 570 N.W.2d 618 (Ct. App. 1997).  In *Quartana*, a car accident led an officer to the suspected driver's home.  *Id.* at 443-44.  Once the officer arrived at the home, he observed that the driver had bloodshot, glassy eyes and smelled of intoxicants, and the driver eventually admitted to operating the car at the time of the accident.  *Id.* at 444.  The officer informed the driver that he was going to detain him and take him back to the accident scene, which was one mile away.  *Id.* at 443-44.  At the scene, the driver was handed over to the investigating officer who had the driver undergo SFSTs.  *Id.* at 444.  We held that the seizure fell under *Terry* and was not an arrest.  *Quartana*, 213 Wis. 2d at 448.  Specifically, we held that the seizure was "brief in duration and public in nature."  *Id.* at 450 (citation omitted).  The driver was not detained for an unusually long period of time; rather, law enforcement diligently pursued their OWI investigation, and the SFSTs were done immediately upon the driver's arrival back on the scene.  *Id.*  Importantly, we further held that

---

[10] Because a Fourth Amendment arrest analysis is limited to a reasonable person analysis, we conclude Kothbauer's argument related to his traumatic brain injury is not relevant. Whether his traumatic brain injury makes him more "vulnerable than others" does not matter for our inquiry into whether an arrest under the Fourth Amendment had occurred. We only look at whether a reasonable person in the same circumstances would have thought that he or she was under arrest. Therefore, we will not consider Kothbauer's traumatic brain injury in our analysis of this issue.

prior to the SFSTs, no officer communicated—either through their actions or words—that the driver was under arrest. *Id.* at 450-51. If the driver passed the SFSTs, it was clear that he would be able to leave. *Id.*

¶22 Here, we assume Kothbauer was unlawfully searched prior to the SFSTs. Like in *Quartana*, however, Kothbauer was not handcuffed, he was in public, no weapons were drawn, and the seizure was only as long as needed to determine if there was probable cause to believe that Kothbauer had been or was committing a crime. Further, as the court held in *Quartana*, a reasonable person in an OWI stop would think that upon passing the SFSTs, he or she would be free to go. Here, Checkalski had Kothbauer perform SFSTs right after the alleged unlawful search. Despite Kothbauer's argument that four officers were present at the time of the search, the record is clear that there were only two officers on scene when Kothbauer was searched. The other officers did not arrive until after the SFSTs had begun. Even if there were more officers present, that fact does not necessarily change the *Terry* detention into an arrest without more circumstances pointing to an arrest having occurred.

¶23 Kothbauer further contends that he was under arrest after he was told he was not free to leave. But Kothbauer testified at trial that he only asked if he was free to leave after the SFSTs had been conducted—at which time he was placed under arrest. Further, even if he had asked to leave before the SFSTs, Kothbauer's assertion that he was under arrest because the police said he was not free to go ignores what a seizure under *Terry* means—namely, a suspect in a *Terry* seizure is not free to leave as long as the police have reasonable suspicion that the suspect has committed a crime, is committing a crime, or is about to commit a crime. *See State v. Jackson*, 147 Wis. 2d 824, 833-34, 434 N.W.2d 386 (1989);

11

*see also* ***State v. Hogan***, 2015 WI 76, ¶67, 364 Wis. 2d 167, 868 N.W.2d 124 (stating that a traffic stop is not over until a driver is free to leave).

¶24    There is no doubt Checkalski had reasonable suspicion to seize Kothbauer under ***Terry*** at the time of the pocket searches.  Reasonable suspicion is defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." ***Terry v. Ohio***, 392 U.S. 1, 21 (1968).  An officer is permitted to extend a traffic stop beyond the original purpose if he or she obtains additional reasonable suspicion.  ***State v. Smith***, 2018 WI 2, ¶28, 379 Wis. 2d 86, 905 N.W.2d 352 ("Discovering additional reasonable suspicion during the ordinary inquiries can lead to a legal basis upon which to extend the stop beyond the ordinary inquiries.").  Checkalski observed two traffic violations, smelled an odor of intoxicants, and observed that Kothbauer had slowed speech and glassy eyes.  In addition, Kothbauer admitted that he had consumed three alcoholic drinks and Checkalski pulled him over shortly after 2:00 a.m.  *See* ***State v. Post***, 2007 WI 60, ¶¶36-37, 301 Wis. 2d 1, 733 N.W.2d 634 (time of night, particularly "bar time," is relevant factor for determining if reasonable suspicion of intoxicated driving exists).

¶25    While the facts support a conclusion that Kothbauer was "seized" for the purposes of ***Terry***, when examined objectively, the facts do not support a determination that he was under arrest at the time Checkalski searched his pockets. Although the alleged unconstitutional search would entitle suppression of anything of evidentiary value found in Kothbauer's pockets under the exclusionary rule, nothing of evidentiary value was found in his pockets.  Therefore, Kothbauer's ineffective assistance of counsel claim fails on the second ***Strickland*** prong—i.e., any deficiency on the part of Kothbauer's defense counsel was not prejudicial. Although there was an illegal search, that search did not convert the ***Terry*** stop

into an arrest. Furthermore, Kothbauer fails to explain how the tobacco tins, or suppression of the same, would have any bearing on the outcome of the PAC charge of which Kothbauer was ultimately convicted.

¶26 Kothbauer further argues that regardless of whether his defense counsel was ineffective for failing to file a motion to suppress evidence obtained following the pocket search, defense counsel was nonetheless ineffective for failing to place more importance on the unlawful search at trial. According to Kothbauer, because the jury acquitted him of the OWI charge, placing more attention on the unlawful search at trial "would have caused the jury to question other procedures used by Checkalski during the investigation and arrest," including the handling of Kothbauer's blood sample.

¶27 At trial, Kothbauer's counsel questioned Checkalski about the pocket search, asking him, "Well, isn't it true that after you got consent to pat him down, you just went directly into his pockets, do you recall?" After saying that he did not recall, counsel again asked Checkalski, "But, Officer, you didn't do a pat down. You just went right into his pockets. Is that true?" In response, Checkalski testified, "Based on my report, that is what I located was items in his pockets." Later, during defense counsel's direct examination of Kothbauer, defense counsel again inquired about the pocket search, and Kothbauer testified that he consented to a pat down search but Checkalski instead searched his pockets. As such, we disagree with Kothbauer's contention that his counsel failed to adequately raise the illegality of the search at trial.

¶28 Even if there was an insufficient lack of focus on the search that constituted deficient representation, and assuming the fact of Checkalski performing the pocket search was relevant evidence, Kothbauer cannot show that

13

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See **Strickland***, 466 U.S. at 694. His defense counsel focused on the pocket search at two points during the trial. Kothbauer's mere speculation that the jury would have questioned the police's other techniques to a greater extent if defense counsel had even placed greater emphasis on the pocket search is insufficient to show prejudice.

## II. Lack of probable cause to arrest

¶29 Next, Kothbauer contends that defense counsel was ineffective for failing to file a motion to suppress the results of the blood draw. According to Kothbauer, the SFSTs were incorrectly administered and therefore there was no probable cause to arrest him. Thus, the results of the blood draw would have been suppressed. Specifically, Kothbauer argues that the blood draw, which was obtained after the SFSTs, should have been suppressed because Checkalski: (1) incorrectly administered the SFSTs when he failed to take into account Kothbauer's injuries; (2) failed to check for resting nystagmus;[11] and (3) lost his original police report and rewrote the perceived HGN clues from memory.[12]

¶30 Kothbauer cites the NHTSA Manual, which is the manual used to train officers how to properly conduct SFSTs, to demonstrate that Checkalski

---

[11] Resting nystagmus refers to eye jerking that occurs as the eyes look straight ahead. NATIONAL HIGHWAY TRAFFIC SAFETY ADMIN., U.S. DEPT. OF TRANSP., DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TESTING, INSTRUCTOR GUIDE, Session VIII, 23 (2015).

[12] Checkalski wrote the subsequent report using dash camera video for reference, but the video does not show the HGN test. Regarding the lost report, Kothbauer takes issue only with the HGN test specifically, not the WAT or OLS tests, which are reportedly visible on the dash camera video.

failed to comply with his training in administering the SFSTs. According to Kothbauer, the NHTSA Manual states that prior to administering the HGN test, officers "need to ask subjects questions about their eyes and general health conditions" as well as check for resting nystagmus, which can indicate, among other things, a medical problem. If the officer notes "any abnormal findings on the pre-test checks, the officer may choose not to continue with the testing. If HGN testing is continued, officers are reminded that this does not follow the standardize protocol and should acknowledge such in any report." NATIONAL HIGHWAY TRAFFIC SAFETY ADMIN., U.S. DEPT. OF TRANSP., DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TESTING, INSTRUCTOR GUIDE, Session VIII, 24 (2015). Kothbauer contends that Checkalski did not ask him about any medical issues or note in his report that he checked for resting nystagmus. Similarly, Kothbauer argues that the WAT and OLS tests should not have been done because Kothbauer has balance issues due to injuries sustained in the military, although he does not cite to the NHTSA Manual for this proposition.

¶31 Kothbauer's claim that defense counsel was ineffective by failing to seek suppression of the SFSTs results fails. The NHTSA Manual requires strict compliance with the instructions to avoid the tests' "validity" being compromised. *See id.* at Session VIII, 13. Thus, Kothbauer argues that failure to properly administer the SFSTs cannot serve as a basis for probable cause. Such an approach has been taken by other jurisdictions. *See, e.g.*, **United States v. Horn**, 185 F. Supp. 2d 530, 532-33 (D. Md. 2002) ("[R]esults of *properly conducted* SFSTs may be considered to determine whether probable cause exists …." (emphasis added)); **Duffy v. Director of Revenue**, 966 S.W.2d 372, 378-79 (Mo. Ct. App. 1998) ("Obviously, a scientific test as to intoxication, which is improperly administered in that the person administering it is not able to properly

interpret the result for intoxication, does not tend to prove intoxication under a probable cause … standard."). However, in Wisconsin, there is no requirement of strict compliance with the NHTSA Manual as a prerequisite for SFSTs to be used in determining probable cause of an OWI-related offense.[13]  *See, e.g.*, *City of West Bend v. Wilkens*, 2005 WI App 36, ¶¶12-16, 22, 278 Wis. 2d 643, 693 N.W.2d 324.

¶32  Instead, probable cause—in this context in Wisconsin—requires a "quantum of evidence within the arresting officer's knowledge at the time of the arrest that would lead a reasonable law enforcement officer to believe that the defendant was operating a motor vehicle [with a PAC]." *State v. Blatterman*, 2015 WI 46, ¶29, 362 Wis. 2d 138, 864 N.W.2d 26 (citation omitted). Probable cause determinations are examined under the totality of the circumstances. *Id.*, ¶34. In a similar case, a defendant argued that his PBT and all postarrest evidence should be suppressed because of the unreliability of poorly administered SFSTs. *Wilkens*, 278 Wis. 2d 643, ¶¶1, 12. We interpreted the issue raised as one of admissibility. *Id.*, ¶¶12-13. We held that SFSTs "are merely observational tools that law enforcement officers commonly use to assist them in discerning various indicia of intoxication, the perception of which is necessarily subjective." *Id.*, ¶1. Consequently, we held that "the procedures the officer employed go to the weight of the evidence, not its admissibility." *Id.* In all, "nothing precluded the trial

---

[13] Kothbauer cites *State v. Zivcic*, 229 Wis. 2d 119, 598 N.W.2d 565 (Ct. App. 1999), in support of his claim that noncompliance with the NHTSA Manual is grounds for excluding SFSTs from evidence. But *Zivcic* dealt with whether an officer was properly trained to conduct the HGN test and could testify as an expert regarding that test, not whether the test was properly considered for purposes of establishing probable cause. *Id.* at 127-29 ("As long as the HGN test results are accompanied by the testimony of a law enforcement officer *who is properly trained* to administer and evaluate the test, the mandates of [WIS. STAT. § 907.02 Testimony by Experts], are satisfied." (emphasis added)).

court from considering [the officer's] testimony about what he observed when he administered the [SFSTs]" when determining probable cause. *Id.*, ¶24. Therefore, the fact that Checkalski did not ask Kothbauer about his physical ailments prior to administering the SFSTs is not dispositive when determining the existence of probable cause in Wisconsin. Similarly, Checkalski's failure to check for resting nystagmus prior to administering the HGN is not fatal when analyzing whether there was probable cause to arrest Kothbauer.

¶33     Here, there were sufficient indicia Kothbauer had committed an OWI-related offense when examined under the totality of the circumstances. Aside from the SFSTs, Checkalski observed other evidence of intoxication, which included the poor driving, "slight odor of intoxicants" coming from the car, Kothbauer's admission to drinking that night, his slowed speech, and his glassy eyes. Additionally, Checkalski pulled Kothbauer over at approximately 2:00 a.m. *See State v. Lange*, 2009 WI 49, ¶32, 317 Wis. 2d 383, 766 N.W.2d 551 (time of night is relevant when determining probable cause to arrest for intoxicated driving). Checkalski's observations, including Kothbauer's performance on the SFSTs, created probable cause to arrest, and therefore defense counsel was not deficient in not filing a motion to suppress evidence following Kothbauer's arrest.[14]

¶34     Kothbauer also asserts that the motion to suppress evidence obtained after his arrest due to the poorly administered SFSTs would have been successful

---

[14] Kothbauer also asserts that defense counsel was ineffective for not questioning Checkalski on his training with the NHTSA Manual at a motion hearing and at trial. Checkalski did testify at trial that he was trained in administering SFSTs, and Kothbauer puts forth no evidence suggesting otherwise. Therefore, this argument fails on *Strickland*'s deficient performance prong.

because Checkalski rewrote his police report two to three weeks after the traffic stop. According to Kothbauer, the circuit court would have found Checkalski's memory on the SFSTs unreliable at a suppression hearing because the HGN test was not visible on the dash camera video.

¶35 Kothbauer, however, cites to no evidence showing that Checkalski's memory was not at least somewhat accurate. Except for the HGN clues, Checkalski used the dash camera video to assist him in determining which clues he observed when conducting the SFSTs. Even though the HGN test could not be observed on the dash camera video, the probable cause determination was made using a number of observations, not just the HGN test result. As discussed already, probable cause determinations are examined under the totality of the circumstances. There was certainly probable cause to arrest Kothbauer despite Checkalski not being able to verify his memory regarding the HGN clues by using the dash camera video. Kothbauer has failed to show prejudice from any alleged deficiency in this regard because there is no reasonable probability a motion to suppress would have been granted based on the fact Checkalski rewrote his report. Instead, the fact that Checkalski rewrote his report and may have had a resulting lapse of memory is a credibility issue for the jury to weigh. *See* WIS JI—CRIMINAL 300 (2000) (Credibility of Witnesses).

**III. Lack of focus on certain evidence**

¶36 Kothbauer next argues that defense counsel was ineffective for not questioning Checkalski at trial about his failure to: (1) properly follow the NHTSA Manual; (2) present the dash camera video for evidence at trial; and

(3) present Kothbauer's medical records for evidence at trial.[15] According to Kothbauer, all three of these avenues would have led the jury to acquit on the PAC charge because they would have demonstrated that he was not intoxicated prior to arrest.

¶37 Normally, the fact that Kothbauer was acquitted of the OWI charge would make any argument about prearrest behavior irrelevant. An OWI conviction requires, among other elements, that the jury find the defendant "under the influence of an intoxicant," meaning his or her ability to operate a vehicle was impaired due to alcohol consumption. WIS JI—CRIMINAL 2669 (2015). Conversely, a PAC conviction requires that the defendant have a concentration of 0.08 grams or more of alcohol in 100 milliliters of the person's blood. WIS JI—CRIMINAL 2669 (2015).[16]

¶38 In this case, however, one of Kothbauer's defenses at trial was the "curve" defense—i.e., that his BAC became a 0.08 or higher after he was finished driving but before his blood was tested due to how the body absorbs and eliminates alcohol. The court agreed that the defense had been sufficiently brought up to warrant a "curve" jury instruction. *See* WIS JI—CRIMINAL 234 (2004). The instruction at trial read:

---

[15] Kothbauer also states that defense counsel was ineffective for not showing the jury that Checkalski lost his initial report and had to refresh his recollection regarding the SFSTs by using the dash camera video, which, again, does not clearly show the HGN test. But, in fact, defense counsel did bring this issue up at trial during his cross-examination of Checkalski. Counsel also focused on that point during his closing argument, saying: "The testimony is that the [HGN] report was lost. This is an incident that happened three years ago. The officer can recall and does state in his report about being some clues on that, but in reviewing the [dash camera video] recording, wasn't able to determine anything more."

[16] For convictions, both OWI and PAC also require the jury to find that the defendant drove or operated a motor vehicle on a highway. WIS JI—CRIMINAL 2669 (2015).

> Evidence has also been received as to how the body absorbs and eliminates alcohol. You may consider the evidence regarding the analysis of the blood sample and the evidence of how the body absorbs and eliminates alcohol along with all the other evidence in the case, giving it the weight you believe it is entitled to receive.

¶39 In other words, Kothbauer claims the evidence of his prearrest behavior that defense counsel failed to present would have supported his claim that his BAC only exceeded the legal limit after he was stopped and prior to his blood draw—i.e., that he did not drive with a PAC. Kothbauer's claim that defense counsel was ineffective for failing to provide evidence of his prearrest behavior is therefore relevant for this court to consider.[17]

## A. Lack of focus on NHTSA Manual

¶40 First, Kothbauer asserts that had the jury heard a line of questioning regarding the specific standards set forth in the NHTSA Manual and Checkalski's answers thereto, the jury would have seen "that Mr. Kothbauer should not have been arrested for OWI [nor] charged with PAC …." Kothbauer's assertion that defense counsel would have swayed the jury to acquit him of the PAC charge by focusing more on Checkalski's failure to comply with the NHTSA Manual is misplaced. As an initial matter, defense counsel did question Checkalski on his administration of the SFSTs, albeit not by directly referencing the NHTSA Manual:

> Would you agree that nystagmus, in other words, the jerking, can be due to causes other than alcohol?

---

[17] The circuit court denied Kothbauer's postconviction motion concluding that his medical records were only relevant to the OWI charge, of which he was acquitted. For the reasons stated, we conclude that the court's decision in this regard was in error.

....

> For the maximum deviation, isn't it true that if you only see faint jerking, then you can't score that item as a clue, correct?

> ....

> In your training, at maximum deviation, the jerking has to be moderate or distinct, true?

> ....

> Hasn't research shown that—he would have to hold his leg up for 30 seconds or count to 30, correct?

¶41 Defense counsel also spent a significant amount of time on cross-examination questioning the State's expert on how the body absorbs and eliminates alcohol, and counsel brought that evidence into the theory of defense during closing arguments. For example:

> Q: Would you agree … that the alcohol taken in on a last drink takes some time to be absorbed into the bloodstream?
>
> A: Yes, sir.
>
> Q: And so depending upon certain factors, you've said there can be an ascension on the curve. If someone's taken a last drink, the alcohol would be absorbed and it would be ascending and not descending?
>
> A: Yes, so long as the rate of absorption exceeds the rate of elimination.

Defense counsel then focused on the State's expert witness's testimony during closing argument:

> The blood alcohol concentration, the testimony's been that the test that was actually obtained was a test one hour and eight minutes after bar closing time, one hour and fifteen minutes, actually, but one hour and eight minutes from when the officer stopped [Kothbauer], and the factors that can affect that have been testified to by the expert.

21

.…

> The testimony has been that the body has so much time in order to absorb, it's not just the alcohol in the stomach. It's what gets into the system, and here the alcohol process took some time, and an hour and fifteen minutes later, after bar closing time, they get a sample. That can be affected by many factors.

In other words, the jury heard ample evidence on the curve defense and how Checkalski's failure to comply with NHTSA protocols and properly administer the SFSTs tied into the theory of defense.

¶42 Most importantly, however, the State presented the jury with ample evidence to convict on the PAC charge despite defense counsel's focus on the NHTSA Manual. First, the State extensively questioned its expert on how the body absorbs alcohol. For example:

> Q: Now, the stop in this matter took place at 2:07, approximately, a.m., and the draw was at 3:15 a.m. There's absorption and elimination that comes into this scenario. Is that correct?
>
> A: Potentially.
>
> Q: And just as a hypothetical, assume that [Kothbauer] stopped drinking an hour before the stop. How does the body absorb alcohol up to the time of the stop and beyond?
>
>  .…
>
> A: When a person is consuming alcohol, they will absorb essentially all of the alcohol within an hour, so if no alcohol was consumed in the hour prior to the stop, at the time of the stop, that individual would have reached their highest blood alcohol content and would only be eliminating alcohol.
>
>  .…

> Q: So if somebody had an hour between consumption and driving, they would be at their highest level at that point in time?
>
> A: They would be at or beyond their highest level.

This questioning contradicted Kothbauer's curve defense. Additionally, the jury was instructed that a BAC over 0.08 taken within three hours of operation of the motor vehicle was, by itself, evidence "that the defendant was under the influence of an intoxicant at the time of the alleged [driving] or that the defendant had a [PAC] …." WIS JI—CRIMINAL 2669 (2015). In other words, the BAC "is prima facie evidence" of guilt if taken within three hours. WIS. STAT. § 885.235(1g)(c). Kothbauer's BAC was 0.127 at the time of the blood draw. The State reiterated the jury instruction during closing, saying, "Based on the jury instructions, if you look at that result and if it's within three hours of driving, you can look at it as being proof that he was under the influence and also driving with a [PAC]." Kothbauer cannot show that additional questioning on Checkalski's failure to comply with the NHTSA manual requirements in administering the SFSTs would have resulted in an acquittal on the PAC charge, even when considering his "curve" defense.

### B. Dashboard camera video

¶43 Next, Kothbauer argues that defense counsel was ineffective for failing to present the dash camera video to the jury. The dash camera video purportedly recorded the entire incident, including Kothbauer's driving, the SFSTs

(other than the HGN test), and the arrest.[18] The dash camera video allegedly shows that Checkalski did not ask Kothbauer if he had any physical ailments or head injuries before conducting SFSTs, as required by the NHTSA Manual; that Checkalski searched Kothbauer's pockets after asking to do a pat down; that Checkalski informed Kothbauer he could perform an alternative test to the WAT test despite his testimony at trial that he did not say Kothbauer could do an alternative test; and that Checkalski never told Kothbauer that he would penalize him for not performing the WAT test, even though Checkalski did take that into consideration at the scene.

¶44 According to Kothbauer, had the jury seen the above incidents on video, it would have doubted other procedures done by Checkalski and therefore would have acquitted Kothbauer on the PAC charge. Kothbauer also contends that the dash camera video shows he "was not exhibiting the behavior of a person who was" above the legal limit.

¶45 Kothbauer's assertions are again speculative and conclusory. While the parties agree that the circuit court erred when it labeled defense counsel's failure to play the dash camera video as "strategic,"[19] Kothbauer again fails to

_____

[18] The actual dash camera video is not part of the appellate record. It was Kothbauer's responsibility, as the appellant, to ensure completion of the appellate record. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381 ("It is the appellant's responsibility to ensure completion of the appellate record and 'when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the trial court's ruling.'" (citation omitted)). That said, the dash camera video does not affect the outcome of our decision. Therefore, we will assume for purposes of this appeal that the dash camera video depicts what Kothbauer asserts.

[19] In its order denying the postconviction motion, the circuit court ruled that Kothbauer's defense counsel's decision not to show the dash camera video was a strategic decision that the court would not second-guess. The State concedes that the court's ruling in this regard was incorrect.

show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Although Kothbauer argues that Checkalski never asked him if he had any physical impairments, Kothbauer testified that he told Checkalski about his impairments. It was up to the jury to determine whether Checkalski's failure to inquire about Kothbauer's injuries affected his credibility and, if so, to what extent. Additionally, we already determined that the fact that Checkalski did not ask about Kothbauer's impairments related primarily to his compliance with the NHTSA Manual did not amount to ineffective assistance of counsel. *See supra* ¶¶40-42. We similarly decided that defense counsel's failure to further pursue the pocket search did not amount to ineffective assistance of counsel. *See supra* ¶¶26-28.

¶46 Further, Kothbauer has not demonstrated that he was prejudiced when the jury did not see that portion of the dash camera video showing that Checkalski allegedly told him he could do an alternative test to the WAT test, despite Checkalski's testimony that he did not tell him that. What matters most is that the jury heard testimony that Kothbauer did not perform the WAT test because of his leg injury from serving in Iraq. Moreover, on cross-examination, defense counsel asked Checkalski if Kothbauer informed him of his leg injury and of the fact that he had balance issues. Checkalski said "yes," and defense counsel then asked, "He didn't perform the [WAT] test then, correct?" Checkalski responded that he did not. It was the jury's decision whether to credit either Checkalski's or Kothbauer's testimony on the reason Kothbauer failed to perform the WAT test, or to disregard the import of that test entirely.

¶47 Kothbauer also argues that the dash camera video would have supported his testimony that Checkalski never told Kothbauer that he would be

penalized for not performing the WAT test; however, there was no testimony by Checkalski saying that he would penalize Kothbauer and no evidence that he did so. Checkalski simply testified that he would take Kothbauer's leg injury into consideration during the exercise.

¶48    In his postconviction motion, Kothbauer also contended that the dash camera video would have demonstrated to the jury that prior to the blood draw he was not exhibiting the behavior of a person who was above the legal limit. The State, however, asserts that the dash camera video would have actually prejudiced Kothbauer if it was shown to the jury. For example, the State claims the video shows Kothbauer as "argumentative," "belligerent[,] and hostile." Even if the dash camera video did show Kothbauer behaving in a normal manner, given the other evidence introduced at trial—particularly, the evidence showing that Kothbauer's BAC was 0.127 within three hours of his driving, thus constituting prima facie evidence that he had a PAC while driving—it is not reasonably probable that the jury would have acquitted Kothbauer of the PAC charge had it seen the dash camera video. Similarly, the jury heard ample evidence in support of Kothbauer's curve defense. As such, any error by defense counsel in failing to present the dash camera video to the jury did not prejudice Kothbauer.

## C.  Failure to present medical records or expert testimony

¶49    Kothbauer argues that defense counsel was ineffective by failing to present Kothbauer's medical records or, alternatively, by failing to hire an expert to testify regarding Kothbauer's disabilities. On the day of trial, but before opening statements, Kothbauer's defense counsel admitted that he did not have the ability to lay a foundation to introduce Kothbauer's medical records into evidence. Kothbauer's medical records indicate that he suffered a traumatic brain injury in

26

2010 while serving in Iraq and that he was subsequently diagnosed with the head trauma in June 2011.

¶50    Kothbauer's medical records could have been admitted without supporting expert testimony under WIS. STAT. § 908.03(6m)(b)1. if defense counsel had obtained certified medical records and had served them on the State at least forty days before trial.[20]  The records also could have been admitted through testimony from Kothbauer's physician or another qualified expert witness. Kothbauer states that an expert "would have testified [that Kothbauer's] performance on the SFST[s] was due to his disabilities, not his [BAC] being above a [0].08."  That testimony, according to Kothbauer, would have established that his lack of balance, nystagmus, and slowed speech were caused by medical ailments, not intoxication.

¶51    To begin, evidence of his medical ailments did come into evidence through testimony at multiple points.  On direct examination, Checkalski testified that Kothbauer informed him of his physical ailments that stemmed from his service in Iraq, although he did not notice any issues when Kothbauer was walking.  Further, during Kothbauer's testimony, his counsel inquired numerous times about his military service and his injuries stemming from his time in Iraq. Kothbauer responded with details about both matters.  Kothbauer also testified that he told Checkalski about his balance and neurological issues while he was performing the SFSTs.

---

[20] Under WIS. STAT. § 908.03(6m)(b)2., defense counsel could have also notified the State of the records and provided it with a time and location to inspect the records prior to trial.

¶52    In addition, the medical records are not as clearly beneficial to the defense as Kothbauer asserts.  For example, following a June 2011 physical examination, the doctor found that Kothbauer was "able to walk on toes and heels and perform single leg stance."  In another visit, the doctor found that Kothbauer's "ability to use input cues from visual system to maintain balance" was within normal limits.  While it is possible an expert may have been able to explain Kothbauer's results and attribute them in a way favorable to Kothbauer and his performance of the SFSTs, Kothbauer cannot show he was prejudiced by counsel not seeking to admit the records into evidence at trial.  In addition to hearing ample evidence on his curve defense and the BAC prima facie evidence jury instruction, the jury heard testimony about his injuries without the medical records being admitted, and it was the jury's job to weigh the evidence.[21]

## IV.  Denial of Kothbauer's postconviction motion without a *Machner* hearing

¶53    Lastly, Kothbauer contends that the circuit court erred in denying his postconviction claims of ineffective assistance of counsel without an evidentiary hearing.  A *Machner* hearing "may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance."  *State v. Thiel*, 2003 WI 111, ¶2 n.3, 264 Wis. 2d 571, 665 N.W.2d 305.  A circuit court

---

[21] In light of the above analyses, there is no merit to the position that the cumulative effect of any ineffective assistance was prejudicial.  First, Kothbauer fails to demonstrate ineffective assistance of counsel regarding any motions to suppress.  He cannot show that the motions would have had a reasonable probability of being granted had they been filed.  His claims that defense counsel should have focused more at trial on certain evidence also fail, even when considered cumulatively.  Defense counsel did focus on the evidence at trial, and Kothbauer cannot demonstrate that "there is a reasonable probability that, but for [defense counsel's lack of focus on the evidence], the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694.  Lastly, and for reasons stated, the cumulative impact of showing the dash camera video and admitting the medical records is too low for Kothbauer to meet his burden under *Strickland*.

has the discretion to deny a postconviction motion without a *Machner* hearing "if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, *or if the record conclusively demonstrates that the defendant is not entitled to relief.*" **State v. Roberson**, 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (citation omitted).

¶54     As discussed above, the record conclusively demonstrates that defense counsel was not ineffective, even assuming Kothbauer's alleged facts as true.  We therefore conclude that the circuit court did not err in denying Kothbauer a hearing on his postconviction motion alleging ineffective assistance of counsel.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.